No. 15 April 17, 2025 475

IN THE SUPREME COURT OF THE
STATE OF OREGON

WESTON TWIGG,
an individual, and
Carrie Twigg, an individual,
*Petitioners on Review,*

*v.*

ADMIRAL INSURANCE COMPANY,
a Delaware company,
*Respondent on Review.*

ADMIRAL INSURANCE COMPANY,
*Third-Party Plaintiff,*

*v.*

RAINIER PACIFIC DEVELOPMENT LLC,
an Oregon limited liability company,
*Third-Party Defendant.*
(CC 19CV36547) (CA A175084) (SC S070191)

On review from the Court of Appeals.*

Argued and submitted December 14, 2023.

Emily S. Miller, Miller Insurance Law LLC, Portland, argued the cause and filed the briefs for petitioners on review.

Jacqueline Tokiko Mitchson, Bullivant Houser Bailey PC, Portland, argued the cause and filed the brief for respondent on review.

Lisa T. Hunt, Law Office of Lisa T. Hunt, LLC, Lake Oswego, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Kyle A. Sturm, Foreman, Sturm and Thede, LLP, Portland, filed the brief for *amicus curiae* United Policyholders and Central City Concern. Also on the brief was Nicholas A. Thede.

_____

\* Appeal from Multnomah County Circuit Court,Stephen K. Bushong, Judge. 324 Or App 259, 525 P3d 478 (2023).

Michael E. Farnell, Paternoster Farnell & Grein, LLP, Portland, and W. Michael Gillette, Schwabe Williamson & Wyatt PC, Portland, filed the brief for *amici curiae* Associated General Contractors, Oregon-Columbia Chapter, American Subcontractors Association, and National Association of Minority Contractors. Also on the brief was Ryan M. DesJardins.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, James and Masih, Justices, and Nakamoto, Senior Judge, Justice pro tempore. **

DeHOOG, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____

** Bushong, J., did not participate in the consideration or decision of this case.

**DeHOOG, J.**

In this insurance coverage case, the parties dispute the meaning of a commercial general liability (CGL) policy that, in relevant part, limits its coverage to "'property damage' *** caused by an *'occurrence*,'" which the CGL policy defined as an "*accident*, including continuous or repeated exposure to substantially the same general harmful conditions."[1] (Emphases added.) Defendant Admiral Insurance Company contends that plaintiffs' claim against the insured contractor for home construction defects did not seek recovery for an "accident," because plaintiffs brought a breach of contract claim, rather than a tort claim. We disagree. Whether an insurance claim seeks recovery for an "accident" does not depend on a plaintiff's pleading decisions in the underlying claim against the insured but depends instead on whether there is a basis in fact for imposing tort liability. Because there are factual disputes material to whether such a basis exists here, we hold that the trial court erred in granting defendant summary judgment and that the Court of Appeals erred in affirming that judgment.

## I.  BACKGROUND

A.  *Facts and Arbitration Proceedings*

In 2011, plaintiffs hired defendant's insured, Rainier Pacific Development LLC, a general contractor, to build a home on a hillside lot. Once construction was substantially complete and plaintiffs had taken possession of their new home, they notified Rainier Pacific of various construction defects. Among other complaints, plaintiffs noted that the concrete slab that Rainier Pacific had laid to create the garage floor was "sloped and cracked in the middle area" and "slope[d] inward, toward the house, raising the risk of water damage to the house[.]" Rainier Pacific agreed to repair the garage floor and address other specified issues. However, Rainier Pacific failed to meet its agreed-upon

---

[1] The relevant section of the insurance policy provides that the insurer will "pay those sums the insured becomes legally obligated to pay as damages because of *** 'property damage' to which this insurance applies," and "[t]his insurance applies to *** 'property damage' only if *** [it] is caused by an 'occurrence[.]'" The policy later defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

deadlines, leading plaintiffs to initiate arbitration proceedings. But rather than proceed with arbitration at that time, plaintiffs and Rainier Pacific settled their dispute through a "Repair Agreement," in which they established "specific performance standards" for completing specified repairs.

Rainier Pacific's performance under the Repair Agreement, and particularly its efforts to address the issues with plaintiffs' garage floor, are central to this case. As to those issues, the Repair Agreement required Rainier Pacific to do the following:

> "Achieve 1/8[-inch] per foot consistent slope across the entire surface of the garage and correct the drainage issue at the front of the garage, intergrating [*sic*] new apron concrete between the drain and the garage floor. Finished garage floor shall be waterproof and shall be approved structurally by [an identified engineer]."

To fulfill that obligation, Rainier Pacific hired a subcontractor to install a "lightweight concrete overlay" known as the "Ardex," which, under the terms of the Repair Agreement, was to be laid over the previously installed garage floor. The subcontractor completed its installation of the Ardex, but, before Rainier Pacific had completed any other work under the Repair Agreement, plaintiffs reinitiated arbitration.

In their statement of claim to the arbitrator, plaintiffs alleged that Rainier Pacific had breached the Repair Agreement. Plaintiffs acknowledged that Rainier Pacific had performed "substantive work" on the garage floor, but they contended that the work "must now be redone" due to Rainier Pacific's flawed installation of the Ardex:

> "[T]he slope [of the Ardex] is not continuous, the surface is not smooth, and the application is not waterproof. Moreover, [Rainier Pacific] failed to carry the slab's control joints up through the [Ardex], which is required by the manufacturer."

Plaintiffs further described the "end result" of Rainier Pacific's work on the garage floor as "a monolithic pour that still ponds and absorbs water, and for which the manufacturer will offer no warranty." Due to those issues, as well as Rainier Pacific's purported failure to complete the other

agreed-upon work, plaintiffs asserted that they had been compelled to "bring in an outside contractor to perform work sufficient to accomplish the performance standards set forth in the Repair Agreement."[2]

Along with their statement of claim, plaintiffs submitted an expert report that detailed "several outstanding issues" with the garage floor. Among other issues, plaintiffs' expert asserted that the subcontractor's installation of the Ardex had not followed its manufacturer's instructions, which required "control joints" to be carried through during installation:

> "[The manufacturer] specifies ALL construction joints to be carried through. None of the construction joints have been carried through. There is no documentation that locate the existing joints."

As plaintiffs explained in their statement of claim, "[c]ontrol joints are carefully placed break lines designed to allow for expansion, contraction, and movement of concrete slabs without causing damage." Plaintiffs provided a copy of the manufacturer's instructions for installing the Ardex, which specified that it should not be installed over any existing control joints. Instead, the instructions called for control joints to be "carried through" the Ardex from their existing placement in the underlying surface. According to the manufacturer's instructions, the consequences of failing to carry through control joints could result in "cracking" or "disbonding":

> "Under no circumstances should [the Ardex] be installed over any joints or any moving cracks. All existing expansion joints, isolation joints, construction joints and control joints ***, as well as all moving cracks, must be honored up through the topping by installing a flexible sealing compound specifically designed for use in moving joints ***. Failure to do so may result in cracking and/or disbonding of the topping. Even the slightest amount of movement in a control joint will cause [the Ardex] to show a hairline crack in a pattern reflective of the joint."

---

[2] It is undisputed that the subcontractor that installed the Ardex acted on Rainier Pacific's behalf for purposes of that project and that, to the extent that the subcontractor's completion of the project breached any obligations under the Repair Agreement or otherwise, Rainier Pacific was ultimately liable for any resulting damages.

Plaintiffs also submitted a video recording that showed plaintiffs' architect performing a "sounding test" on the Ardex. In the video, the architect dragged chains across the Ardex and tapped a rod against it, both of which resulted in a hollow sound. The architect then poured sand onto the Ardex and again tapped it with a rod, causing the sand to jump along an apparent surface crack. According to plaintiffs, the sounding test demonstrated that there were "voids" between the Ardex and the underlying concrete slab. Those voids, plaintiffs asserted, were proof that the Ardex had "disbonded."

As part of their arbitration claim, plaintiffs sought to recover the cost of correcting Rainier Pacific's work. Plaintiffs retained a third-party contractor to prepare an estimate of that cost. The contractor calculated a single estimate for four specific items, including one entitled "Correct Garage Slope," and estimated that correcting those four items would collectively cost $488,291 (with a ten-percent contingency). In addition to the cost of correcting Rainier Pacific's work, plaintiffs sought $36,500 in liquidated damages for Rainier Pacific's delays in completing the work.

In response to plaintiffs' arbitration claim, Rainier Pacific denied that it had breached the Repair Agreement. Rainier Pacific argued, in relevant part, that the Ardex had been "properly applied." In support of that argument, Rainier Pacific claimed that the product's manufacturer had approved the way in which it had been installed because "control joints [were] not necessary." Plaintiffs disputed that assertion, emphasizing that their architect had repeatedly asked Rainier Pacific for confirmation of the manufacturer's approval. Plaintiffs contended that Rainier Pacific's failure to provide that confirmation proved that the manufacturer's "approval of the installation was never received." Moreover, they noted, Rainier Pacific had neither referenced "manufacturer approval" in its answer nor submitted "any documentation of such approval."

Following arbitration, the arbitrator found that Rainier Pacific's installation of the Ardex had been "defective and contrary to one or more of the manufacturer's directives." For that reason and others, the arbitrator concluded

that Rainier Pacific had breached the Repair Agreement. The arbitrator based that conclusion on the uncontested fact that Rainier Pacific had installed the Ardex without carrying through the control joints from the underlying surface. The arbitrator credited the results of plaintiffs' "sounding test" as evidence that the garage floor "suffer[ed] from voids, apparently between the Ardex and the existing garage slab." Further, the arbitrator determined that Rainier Pacific's installation of the Ardex had left the garage "arguably in worse condition" than it had been prior to the product's installation.

In awarding plaintiffs their damages, the arbitrator concluded that $150,000 of the third-party contractor's estimated cost of repairing Rainier Pacific's work "c[ould] be attributed to the proposed repair of the garage slab" and that the same sum would "serve as a starting point for the determination of damages ***."

A trial court entered judgment against Rainier Pacific in the amount of the arbitrator's award. Plaintiffs sought to execute on that judgment, but those efforts failed. Plaintiffs therefore sued defendant, Admiral Insurance Company, which had insured Rainier Pacific's work on plaintiffs' home through the CGL policy underlying this case, effective August 2016 to March 2018.

B.    *Trial Court and Court of Appeals Decisions*

In their action against defendant, plaintiffs claimed that defendant had a duty to indemnify Rainier Pacific for the damages awarded by the arbitrator. According to plaintiffs, defendant's duty to indemnify Rainier Pacific arose under the CGL policy when Rainier Pacific's defective work caused "property damage" to, among other things, plaintiffs' garage floor.

Defendant answered, denying any duty to indemnify Rainier Pacific for the arbitration award. In relevant part, defendant contended that, because the arbitrator had awarded damages based solely on Rainier Pacific's breach of the Repair Agreement, the CGL policy did not provide coverage. Relying on this court's case law, defendant argued that "breach-of-contract" damages of the sort awarded by the

arbitrator cannot qualify as "property damage" caused by an "occurrence," which the policy defined in relevant part as an "accident." *See Oak Crest Const. Co. v. Austin Mutual Ins. Co.*, 329 Or 620, 627, 998 P2d 1254 (2000) ("accident" within meaning of a CGL policy occurs only if property damage "results, in some sense, from a tort, *i.e.*, a breach of some duty imposed by law").

Defendant subsequently moved for summary judgment, advancing its argument under *Oak Crest* and raising various express policy exclusions.[3] Plaintiffs filed a cross-motion for summary judgment, characterizing defendant's reliance on *Oak Crest* as "misplaced." According to plaintiffs, *Oak Crest* stood for the proposition that, although a "complete failure to perform under a contract" is not a covered "occurrence," a "mistake that results in accidental property damage" *is* an "occurrence." In this case, plaintiffs contended, Rainier Pacific's failure to carry through the control joints as directed by the manufacturer of the Ardex had been a "mistake" that caused "accidental property damage" in the form of "voids" and "cracks" in the garage floor.

Following oral argument, the trial court concluded that defendant was entitled to summary judgment because, as defendant had argued, the damage to plaintiffs' garage had not been caused by an "occurrence." In reaching that conclusion, the trial court explained that it found *Oak Crest* factually and legally "indistinguishable": As in this case, the breach of contract there had been based on defective workmanship and there had been no "general breach of a duty of care," only a breach of contract:

---

[3] In its summary judgment motion, defendant raised the CGL policy's "Pre-Existing Damage Exclusion," arguing that there was "no question" that Rainier Pacific's "defective construction occurred prior to the inception of [the policy]," nor that the arbitrator had "awarded damages based on the cost to repair these defects." Further, in response to plaintiffs' cross-motion, defendant argued that two other exclusions—the "j(5)" and "j(6)" exclusions—also precluded coverage. According to defendant, those exclusions effectively precluded coverage for property damage that occurs "while the insured's operations are ongoing." However, because defendant had not raised the j(5) and j(6) exclusions in its own summary judgment motion, the trial court ruled that those two exclusions were not properly before it. Further, the trial court found it unnecessary to reach the issue of whether the Pre-Existing Damage Exclusion applied. Thus, although the parties discuss the j(5) and j(6) exclusions in their briefing, the question as to whether those apply is not properly before this court. We leave it to the trial court to determine in the first instance whether the Pre-Existing Damage Exclusion may apply.

"But *** having carefully studied the *Oak Crest* case, in light of the arbitration award in this case finding that Rainier Pacific Development had breached its contract, the repair contract, which was a settlement agreement of the original construction defect claim; and that that contractual breach was based on its failure to adequate—its faulty workmanship in installing the repair that it had agreed to install, in my view is indistinguishable in any material way from the shoddy workmanship at issue in the *Oak Crest* case.

"And I do not see that there is a general breach of a duty of care that would distinguish this case from *Oak Crest*. And so I'm required to follow the Oregon Supreme Court's ruling. I'm bound by that ruling until the Oregon Courts decide that that ruling maybe is not quite as nuanced as they had intended as a matter of insurance coverage law. But they haven't said that yet. Maybe they'll get an opportunity to say that in this case.

"But in any event, I think I'm bound by *Oak Crest* and conclude, based on the record in this case fails to establish an accident or an occurrence within the meaning of the policy as construed in the *Oak Crest* case."

The trial court granted defendant's motion for summary judgment, denied plaintiffs' cross-motion, and entered judgment for defendant. Plaintiffs appealed.

On appeal, the Court of Appeals concluded that the trial court had not erred in granting defendant's motion for summary judgment and denying plaintiffs' cross-motion. *Twigg v. Admiral Ins. Co.*, 324 Or App 259, 261, 525 P3d 478 (2023). The court began its analysis by observing that an insurer's duty to indemnify is "based on the nature of the insured's liability in the underlying legal action." *Id.* at 270. The "nature" of Rainier Pacific's liability here, the court reasoned, was based on its breach of the Repair Agreement. *Id.* at 271. That is, Rainier Pacific's liability arose "solely from breach of a contractual duty ***." *Id.* at 272. Relying, as the trial court had, on *Oak Crest*, the Court of Appeals concluded that liability arising from breach-of-contract damages does not qualify as an "accident" and thus does not meet the "occurrence" requirement of a CGL policy. *Id.* at 272-74. Further, although that court acknowledged that plaintiffs' arbitration claim had "raised issues regarding Rainier Pacific's defective

construction in making repairs," the court emphasized that plaintiffs had "never contended that Rainier Pacific's *liability* arose from a separate duty of care[,]" *i.e.* a tort. *Id*. at 273 (emphasis in original). Thus, the court agreed that defendant had no obligation to indemnify Rainier Pacific for the damages awarded in the arbitration proceeding. *Id.* at 274. On that basis, the Court of Appeals affirmed the trial court's judgment. *Id.* Plaintiffs petitioned this court for review.

## C.   *The Parties' Arguments in this Court*

In this court, plaintiffs argue that the trial court and Court of Appeals misinterpreted the meaning of "occurrence" in defendant's CGL policy. Applying the interpretive framework set out in *Hoffman Const. Co. v. Fred S. James & Co.*, 313 Or 464, 469-71, 836 P2d 703 (1992), plaintiffs contend that the meaning of "occurrence" is inherently ambiguous and should be construed more broadly than the courts did below. Under plaintiffs' proposed interpretation, the meaning of "occurrence" should not turn on the legal theory underlying an insured's liability, but rather on whether the property damage alleged was the unintended result of the insured's mistakes. Plaintiffs further contend that *Oak Crest* failed to follow the *Hoffman* framework and, therefore, should not "guide or control the outcome of this case." Conversely, under defendant's proposed interpretation, the meaning of "occurrence" would more narrowly turn on whether the insured's liability is based in tort or in contract. Defendant argues that its interpretation is consistent with *Oak Crest* and urges us to apply the holding of that case here, which defendant contends supports the trial court's ruling.

We conclude that neither party has it quite right. The outcome of this case does not turn on whether we adhere to the holding of *Oak Crest*. Rather, we consider that opinion in the course of applying the *Hoffman* framework, where it guides our interpretation of the disputed terms but does not control whether plaintiffs' property damage resulted from an "occurrence" within the meaning of the CGL policy. And, as we explain below, whether property damage is the result of an "occurrence" depends *not* on whether an insured has been sued in tort, but on whether, by causing property damage, the insured breached a duty imposed by law, and not

one solely arising from contract. Here, because the record raises a genuine question of material fact as to that issue, defendant was not entitled to summary judgment on the grounds stated by the trial court. We therefore reverse the judgment of the trial court and the decision of the Court of Appeals, and we remand the matter to the trial court for further proceedings.

## II. ANALYSIS

### A. *The Meaning of "Occurrence" in Defendant's CGL Policy*

We begin our analysis with a review of the relevant provisions of defendant's CGL policy. Under the "Coverage A" subsection of the policy, defendant agreed to "pay those sums that the insured becomes legally obligated to pay as damages because of *** 'property damage' to which this insurance applies." The CGL policy defines "property damage" as "physical injury to tangible property," and it limits coverage for such damage in several ways, including by requiring that the property damage "occur[] during the policy period" and that it be "caused by an 'occurrence[.]'" The policy defines "[o]ccurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions[,]" but the policy does not further define "accident."

The parties' central dispute in this case ultimately turns on what qualifies as an "accident" under the policy.[4] Because, in relevant part, coverage is limited to property damage caused by an "occurrence"—which, as noted, the policy defines as an "accident"—plaintiffs cannot recover for the damage to their garage floor unless Rainier Pacific's liability for that damage arose from an "accident." The meaning of that term presents a question of law.[5] *See Hoffman*, 313 Or at 469

---

[4] Defendant's CGL policy defines "[p]roperty damage," in part, as "[p]hysical injury to tangible property, including all resulting loss of use of that property." Although defendant argues that, by virtue of the "occurrence" requirement and the potential application of one or more of the policy's exclusions, any property damage was not insured, defendant does not otherwise contend that the resultant condition of plaintiffs' garage floor cannot qualify as "property damage" within the meaning of its policy.

[5] As noted, defendant's CGL policy limits its coverage to "occurrence[s]," which is a defined policy term. However, because the policy defines "occurrence" in part as an "accident," which is not defined, the parties focus their arguments on the meaning of that term. We follow suit.

(interpretation of an insurance policy's terms is a question of law). In interpreting the terms of an insurance policy, our primary goal is to ascertain the intention of the parties, as reflected in the terms and conditions of the policy. *Id.*; *see also* ORS 742.016 (providing that, except under circumstances not present here, "every contract of insurance shall be construed according to the terms and conditions of the policy").

In arguing that the policy's coverage provisions encompass the losses that they incurred here, plaintiffs contend that the term "accident" is "inherently ambiguous" and should be interpreted to include unintended property damage caused by "mistakes" that a contractor may make in fulfilling its obligations under a contract. In plaintiffs' view, defendant's policy insures against mistakes of that kind regardless of whether the insured's liability for them arises in tort or contract; the availability of a tort remedy is, in plaintiffs' view, immaterial. Defendant, in turn, endorses the trial court's conclusion that such coverage is available only if a contractor's liability is based in tort. According to defendant, this court's case law—including *Oak Crest*—as well as the broader context of the policy as a whole, compels the conclusion that "accident" is limited to unintended property damage that gives rise to an insured's liability in tort.

In assessing those arguments, we recognize that this court's *Oak Crest* opinion construed similar policy language, and we acknowledge defendant's argument that we should deem that to control the outcome here. We discuss that opinion and its implications for this case later in this opinion.[6] We begin, however, with our established framework for interpreting an insurance policy, as set forth in *Hoffman*, 313 Or at 469-71.

---

[6] This court has been tasked with interpreting similarly worded policy terms on more than one occasion. *Compare Oak Crest*, 329 Or 628 (2000) ("accident" has a "tortious connotation"), *with St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 206, 923 P2d 1200 (1996) (an "accident" is an "incident or occurrence that happened by chance, without design and contrary to intention and expectation" (citation omitted)). But although our prior decisions may provide helpful contextual evidence of the meaning of the terms at issue here, our interpretive inquiry "does not begin *** with case law." *See Interstate Fire v. Archdiocese of Portland*, 318 Or 110, 117, 864 P2d 346 (1993) (so stating). Rather, our interpretive inquiry "begins with an examination of the words of the applicable provisions." *Id.*

Under *Hoffman*, if a policy expressly defines a term, we apply that definition. *Id.* at 469. But if the policy does not expressly define a term, we turn to other interpretive aids. *Id.* at 470, 474. First, we consider whether the disputed term has a "plain meaning"—that is, whether it is "susceptible to only one plausible interpretation." *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 308, 985 P2d 1284 (1999); *see also St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 206, 923 P2d 1200 (1996) (*McCormick & Baxter*) (applying "common understanding of the term 'accident' by the ordinary purchaser of insurance[,]" which, in the context of that case, was "an incident or occurrence that happened by chance, without design and contrary to intention and expectation" (citation omitted)). If so, that is the meaning that we apply. *Groshong*, 329 Or at 308. If, however, a term is susceptible to more than one plausible interpretation, with each interpretation supporting one or the other side of a dispute, we turn to the context in which the term is used. *Id.* at 312. We first consider the "particular context" in which the term is used; then, if the meaning of the term remains debatable, we look to the "broader context of the policy as a whole." *Id.* If our review of the particular or broader context reveals that, despite there being more than one plausible interpretation of a term, only one such interpretation is ultimately reasonable, that interpretation governs. *Id.* Conversely, if multiple interpretations remain reasonable following that review, we then will apply our final interpretative aid, which requires us to "resolve any doubt as to the meaning of [the] term against the insurer." *Gonzales v. Farmers Ins. Co.*, 345 Or 382, 387, 196 P3d 1 (2008); *see also Hoffman*, 313 Or at 470 (explaining that, if multiple, plausible interpretations "withstand scrutiny," then we construe the term against the insurer).

Applying that framework here, we conclude that our opinion in *Oak Crest* resolves one aspect of the parties' dispute regarding the meaning of "accident" in defendant's CGL policy: Damages arising "solely" from a breach of contract do not qualify as an accident. However, as to another relevant aspect—whether coverage under the policy is dependent upon the pleading and establishing of tort liability—we conclude that both parties' interpretations are reasonable given the broader context of the policy as a whole

and our case law. Thus, we resolve the dispute against the insurer—here, defendant—and in favor of plaintiffs.

1.    *Whether "accident" has a plain meaning*

Because the CGL policy does not expressly define "accident," we start by considering whether "accident" has a plain meaning, that is, whether it is "susceptible to only one plausible interpretation." *Groshong,* 329 Or at 308. As discussed below, dictionary definitions can help inform whether a disputed term has multiple plausible interpretations and therefore lacks a "plain" meaning. *See Hoffman*, 313 Or at 469-70 (parties' competing "plain meaning interpretations, based on dictionary definitions," merely established that disputed term had more than one plausible meaning); *see also McCormick & Baxter*, 324 Or at 204 (turning first to dictionary definitions when policy itself did not define relevant term). However, the fact that a proposed interpretation finds support in a dictionary definition is not enough to establish its plausibility. We will not accept an interpretation as plausible if it conflicts with "what we perceive to be the understanding of the ordinary purchaser of insurance." *Botts v. Hartford Acc. & Indem. Co.*, 284 Or 95, 100, 585 P2d 657 (1978). Thus, although we conclude that plaintiffs and defendant have each offered interpretations of "accident" that are plausible in the abstract, we ultimately conclude that our *Oak Crest* decision provides the relevant interpretation of the term, which we understand to "portray [for purposes of a CGL policy] the common understanding of the term 'accident' by an ordinary purchaser of insurance." *McCormick & Baxter*, 324 Or at 206; *see id.* (so describing other decisions of this court interpreting that term). As we further explain, however, nothing in *Oak Crest*'s holding forecloses plaintiffs' argument that defendant's CGL policy covers the property damage at issue here. Thus, we reject defendant's contention that *Oak Crest*'s understanding of "accident" dictates a particular outcome here.

To determine whether an undefined policy term has a plain meaning, this court often consults *Webster's Third New International Dictionary* (*Webster's*). *See Kohring v. Ballard*, 355 Or 297, 304 n 2, 325 P3d 717 (2014) (noting that, because *Webster's* focus is "descriptive" rather than "prescriptive," it provides insight into how words are ordinarily

used). We thus consider whether *Webster's* defines "accident" broadly enough to encompass both parties' proposed interpretations or, instead, suggests a plain or ordinary meaning that would render either party's proposed interpretation implausible. *See McCormick & Baxter*, 324 Or at 204 (taking that approach).

*Webster's* defines "accident" as follows:

"**1 a :** an event or condition occurring by chance or arising from unknown or remote causes *** [or] **b :** lack of intention *** **2 a :** a *** sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result *** **c :** an unexpected happening causing loss or injury which is not due to any fault or misconduct on the part of the person injured but for which legal relief may be sought."

*Webster's* at 11.

Aspects of that definition are consistent with plaintiffs' position, because they focus on the unexpected or unintended nature of what has occurred rather than the legal implications of such an occurrence: "an event or condition occurring by chance"; a "sudden event *** occurring without intent"; or "an unexpected happening." *Id*. On the other hand, at least one accepted meaning for "accident" does contemplate legal remedies: "an unexpected happening causing *loss or injury *** for which legal relief may be sought*." *Id*. (emphases added). In that regard, at least one meaning of "accident" is consistent with defendant's view that an accident is an occurrence that gives rise to tort liability. *See Black's Law Dictionary* 1917 (10th ed 2014) (defining "tort" in part as "[a] civil wrong, other than breach of contract, for which a remedy may be obtained, [usually] in the form of damages"); *id.* at 1196 (defining " negligence" in part as a "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised" or "any conduct that falls below the legal standard established to protect others against unreasonable risk of harm"). Although *Webster's* does not define "accident" through terminology inherently associated with tortious conduct, its use of the term "carelessness"—as in an "event occurring without intent or volition through *carelessness ***"

(emphasis added)—arguably evokes a concept that in ordinary usage is sometimes equated with a central precept of tort law: reasonable care, or a lack thereof. *See Webster*'s at 339 (defining "careless" in part as "not taking ordinary or proper care" or "done * * * without due care : NEGLECTFUL * * *"). *But see Interstate Fire*, 318 Or at 118 (explaining that the court will construe an insurance policy as incorporating precepts of tort law "only if the policy expressly or by clear inference implicates those precepts").

Based on those dictionary definitions alone, we cannot  say that one side's proposed interpretation of "accident" establishes that term's plain meaning. That is, there is support for plaintiffs' argument that "accident" encompasses unintended property damage caused by "mistakes" a contractor makes while fulfilling its contractual obligations. But there is also support for defendant's view that "accident" as used in the CGL policy contemplates actionable fault, and not merely inadvertence. Thus, both interpretations are plausible as far as dictionary definitions are concerned, and we cannot, on that basis alone, choose one interpretation over the other. *See Groshong*, 329 Or at 310-11 (even where one party's interpretation of term was demonstrably less plausible than the other party's interpretation, that did not render either interpretation *implausible*).

If dictionary definitions were our only source of plain meaning, this part of our analysis would be complete. However, this court's prior opinions also can provide guidance as to a policy term's plain or ordinary meaning. *See McCormick & Baxter*, 324 Or at 204-05 (turning to case law for guidance after determining that dictionary definition of a disputed term was broad enough to encompass both sides' meanings). That brings us to *Oak Crest*, which is a focal point of the parties' respective arguments. In that insurance coverage case, the insured was a general contractor who sued under a CGL policy to recover the costs it had incurred in removing and redoing a subcontractor's paint job after the original paint failed to properly cure. 329 Or at 622. The policy in *Oak Crest* limited its coverage to "occurrence[s]" and, like defendant's CGL policy in this case, defined the term "occurrence" as an "accident," including "repeated exposure

to similar conditions." *Id*. In determining that the insured general contractor was not entitled to recover its repair costs, this court cited a much earlier opinion, *Kisle v. St. Paul Fire & Marine Ins.*, 262 Or 1, 495 P2d 1198 (1972), for the proposition "that there can be no 'accident,' within the meaning of a commercial liability policy, when the resulting damage is merely a breach of contract." *Id*. at 626; *see Kisle*, 262 Or at 6 (stating, as to policy, that "'accident' has a tortious connotation" and that "[d]amage solely caused by failure to perform a contract is not recoverable in tort").

Although we discuss *Oak Crest* here for its significance, if any, on our determination as to whether the term "accident" in defendant's CGL policy has a plain or ordinary meaning that we must apply, we first pause briefly to address the parties' larger dispute regarding that opinion. In defendant's view, we—like the trial court—should conclude that *Oak Crest*'s interpretation of "accident" in the context of that case controls the outcome here. That, defendant argues, would mean that plaintiffs could not recover their damages unless they established that those damages arose from Rainer Pacific's breach of some duty other than its contractual obligations under the Repair Agreement, which defendant contends that plaintiffs did not and could not do.

Plaintiffs, on the other hand, question *Oak Crest*'s precedential value and urge us not to follow it. They, along with *amici curiae* Associated General Contractors, Oregon-Columbia Chapter; American Subcontractors Association; and National Association of Minority Contractors, attribute this court's analysis in that decision to a "deficient factual record" and contend that the precedential value of that opinion should be limited to cases in which the record fails to identify the mistakes, if any, that an insured made to cause the property damage at issue. Plaintiffs assert that, unlike the record in *Oak Crest,* the record in this case *does* identify the insured's mistake that caused the property damage at issue. Plaintiffs therefore contend that *Oak Crest* "should not control or guide the outcome of this case."

Alternatively, although plaintiffs do not contend that we should overrule *Oak Crest*, they argue that the precedential value of *Oak Crest* should be "reconsidered and clarified"

because that decision did not follow our "well-established legal principles for interpreting insurance policies." In plaintiffs' view, our decision in *Oak Crest* "disregarded the common meaning of 'accident' from the perspective of the ordinary insured, used technical tort concepts to define 'accident,' and failed to follow the *Hoffman* \*\*\* methodology for policy interpretation." Accordingly, plaintiffs ask that this court reconsider and clarify *Oak Crest* "to restore stability and predictability in Oregon insurance law."

We conclude that, although *Oak Crest* is not, as defendant suggests, wholly dispositive, that opinion is both precedential and helpful to our present inquiry. Our decision in *Oak Crest* did not purport to follow *Hoffman*'s framework, but it serves an important role within that framework. As we understand *Oak Crest*, contrary to plaintiffs' view, that decision identified—although only implicitly so—"the common understanding of the term 'accident' by an ordinary purchaser of insurance." *See McCormick & Baxter*, 324 Or at 205-06 (consulting case law for that purpose at first stage of the *Hoffman* analysis). *Kisle*, the case cited in *Oak Crest* for the meaning of "accident," predated *Hoffman* and did not resort to dictionaries in search of that term's "plain meaning." But, in concluding that "accident" did not encompass the losses at issue in that case, the *Kisle* court did rely in part on what it understood to be the expectations of those who purchase general liability policies: protection against claims made by third parties, *not* protection against claims made by a party to whom the insured was contractually bound. 262 Or at 5-6 (quoting from a journal article to that effect). That, plus a brief review of contract and tort cases, led the *Kisle* court to hold that, when used in a CGL policy, the term "accident" has a "tortious connotation." *Id.*

In adopting *Kisle*'s interpretation of "accident" for purposes of the CGL policy at issue in *Oak Crest*, this court simply gave it the meaning that—as *Kisle* had concluded—the typical purchaser of general liability insurance would give it. The *Oak Crest* court did not purport to interpret the term "accident" anew, nor did the court expand upon *Kisle*'s holding in that regard. Rather, *Oak Crest* quoted extensively from *Kisle*, including the following passage, in which

the *Kisle* court both expressed the limits of its holding and acknowledged that, in certain instances, a party to a contract may recover damages caused by the negligent performance of that contract:

> "We find there is a significant distinction between negligent performance of a contract *and a complete failure of timely performance*. We hold that damage caused by the latter is not caused by accident.
>
> "We do not need to definitively define 'accident'; however, we do hold that 'accident' has a tortious connotation. *Damage solely caused by failure to perform a contract is not recoverable in tort*. A tort is a breach of a duty created by law and not necessarily by the agreement of the parties. \*\*\* Damage caused by the negligent performance of a contract can in certain instances be recoverable in tort. \*\*\* Damages caused by a failure to perform 'amount to mere breaches of contract, for which no tort action will lie.'"

*Kisle,* 262 Or at 6-7 (citations omitted; emphases added). Relying on *Kisle*'s interpretation of "accident" as used in a CGL policy, the *Oak Crest* court held that the insured contractor in that case could not recover the costs it had incurred in repairing its subcontractor's defective paint job. 329 Or at 628 (concluding, based on the facts in summary judgment record, that the insured's liability "arose solely from a breach of contract and, therefore, [was] not covered by the policy").

We glean two significant points from *Oak Crest*. First, although that opinion informs our understanding of the plain meaning of the term "accident" when used in CGL policies, it provides more guidance as to what does *not* qualify as an accident than as to what *does*. That is, in barring the insured's recovery for damages arising "solely from a breach of contract," the *Oak Crest* court relied extensively on *Kisle*, including that decision's reference to damages caused by "'a complete failure of timely performance'" and damage "'solely caused by failure to perform a contract.'" *Oak Crest*, 329 Or at 627 (quoting *Kisle*, 262 Or at 6). Second, and relatedly, *Oak Crest* suggests that, in determining whether a claim arises solely from a breach of contract such that it does not give rise to a covered "accident," we examine the evidentiary record of the underlying proceedings, and not merely the pleadings. *See id.* at 628 (unsuccessfully searching

summary judgment record for evidence to support a finding that "the problem with the \* \* \* painting resulted from the subcontractor's breach of a duty to act with due care"). We address the significance of that second point later in this opinion. For now, we focus on the first point: Damages that arise solely from a breach of contract do not qualify as damages caused by an accident.

Although as noted, *Oak Crest* is not dispositive, that opinion, like the definition of "accident" in *Webster's*, provides at least arguable support for each side's understanding of what constitutes an "accident" under defendant's CGL policy. To the extent that the essence of defendant's argument is that, for unintended property damage to be covered by its CGL policy, it must be the result of something more than Rainier Pacific's failure to fulfill its contractual obligations under the Repair Agreement, *Oak Crest* appears to support that view. *Id.* at 627 (citing *Kisle*'s holding that "'accident' has a tortious connotation"). Moreover, the defective paint work in *Oak Crest* is difficult to view as anything other than an unintended result of a "mistake" of some kind, yet this court still found it necessary to search the record for evidence of a breach of a duty other than that imposed by the terms of a contract. Thus, *Oak Crest* cannot easily be reconciled with plaintiffs' view that it is immaterial whether an insured's liability arises in contract or tort so long as the alleged property damage is the unintended product of a "mistake." Rather, we understand *Oak Crest* as establishing that, in the absence of evidence of a contrary intent, a typical purchaser of general liability insurance would not expect its "accident" provision to cover ordinary breaches of contract, even those involving faulty workmanship or "mistakes."[7]

On the other hand, certain aspects of *Oak Crest* are more favorable to plaintiffs' argument that "accident" can

---

[7] To be clear, we apply our understanding of *Oak Crest*'s holding to the parties' dispute in this case. Because no party has expressly asked that we overrule that decision or established that this court's opinion in *Oak Crest* warrants reversal, we do not undertake that inquiry here. That said, even if this court might ultimately conclude that *Oak Crest* was wrongly decided, that opinion would still be evidence of the contracting parties' intended meaning for *this* CGL policy, which was agreed to well after the issuance of *Oak Crest. See Gonzales v. Farmers Ins. Co.*, 345 Or 382, 388, 196 P3d 1 (2008) ("An interpretation of the same or similar policy terms in this court's prior case law can supply helpful contextual evidence of the intent that underlies the use of those terms in the policy in question here.").

encompass the property damage incurred in this case, even though in the arbitration proceeding they pursued recovery for breach of a contract—the Repair Agreement—and did not expressly pursue damages in tort. Those include the court's repeated emphasis on damages that result *solely* from a breach of contract and its recognition that, in some instances, "negligent performance of a contract might cause damage by 'accident.'" 329 Or at 627 (explaining *Kisle*'s distinction between such circumstances and circumstances where "the damage results solely from the complete failure of timely performance, generally actionable only as a breach of contract"). Those aspects of *Oak Crest*, together with the court's search for evidence of a breach of a noncontractual duty even though the insured in that case had not alleged such a breach, suggest that, despite *Oak Crest*'s conclusion that "accident" requires tortious conduct, it is not essential that there be a formal allegation of tort liability—much less adjudicated tort liability—before an insured may recover for accidental property damage.

Ultimately, we take *Oak Crest* at its word, but we proceed further in our effort to determine whether the CGL policy's requirement of an "accident" means that plaintiffs cannot recover here because they did not establish that Rainier Pacific would have been liable to them in tort. That is, we accept *Oak Crest*'s determination that, when used in a CGL policy, "accident" has a "tortious connotation" and "exists only when damage results, in some sense, *from a tort*, *i.e.*, a breach of some duty imposed by law," as opposed to by contract. *Id.* (internal quotation marks omitted; emphasis added). Thus, insofar as plaintiffs contend that, as long as the unintended property damage was the product of a "mistake," it is covered under the CGL policy even if Rainier Pacific's only obligation to prevent that damage arose from the terms of the Repair Agreement, *Oak Crest* forecloses that interpretation of "accident."[8] But, to the extent that plaintiffs argue they were not required to raise an *allegation* of tort liability even if "accident" means that there must have some *basis* in tort law, *Oak Crest* does not address that issue.

---

[8] Although plaintiffs make various context-based arguments regarding the parties' intended meaning of "accident," they do not contend that this is a circumstance in which the parties have expressly contracted to give a term something other than its plain or ordinary meaning.

To summarize so far, both sides offered what initially appeared to be plausible meanings for the policy term "accident." That is, looking first to the *Webster's* definition of that term, we concluded that it was "broad enough to cover the proposed definitions of both sides." *McCormick & Baxter*, 324 Or at 204.[9] Turning to whether our case law sheds further light on the plain meaning of "accident" when used in CGL policies, we then concluded that *Oak Crest* forecloses one aspect of plaintiffs' argument, namely, their argument that the existence of tort liability is wholly immaterial so long as unintended property damage resulted from an insured's "mistakes." That is, under *Oak Crest*, for an "accident" to have occurred, there must be a basis for holding an insured liable for property damage *other* than the insured's obligations under a contract. But that conclusion does not wholly resolve the parties' dispute about the meaning of "accident," nor does it directly address the issue at the core of the trial court's ruling: whether, for an insured's liability to have arisen from an "accident," there must have been an allegation or showing of tort liability in the proceeding that resulted in the insured's liability. Stated in *Hoffman* terms, with regard to whether coverage requires that an insured establish liability for tort damages, "accident" has no "plain meaning." *See* 313 Or at 474 (holding that a term has no "plain meaning" when it is "susceptible to more than one plausible interpretation"). Thus, we proceed to the next step of our analytical framework and examine the policy's use of "accident" in context.

2. *Whether context clarifies the relevant meaning of "accident"*

a. The "particular context"

We first examine the "particular context" in which "accident" is used in defendant's policy. Although this court has not precisely defined what constitutes a term's

---

[9] In *McCormick & Baxter*, we held that the dictionary definition of "accident" was broad enough to encompass both proposed interpretations, but ultimately held that the common understanding of that term is an "'incident or occurrence that happened by chance, without design and contrary to intention and expectation.'" 324 Or at 206 (quoting *Finley v. Prudential Ins. Co.*, 236 Or 235, 245, 388 P2d 21 (1963)). That meaning is consistent with both parties' interpretation of the policy here, but it does not resolve the dispute surrounding the meaning of "accident" present in this case.

"particular context," at a minimum it logically must include the language immediately surrounding the disputed term "accident," specifically, the term it purports to define—"occurrence"—and the "including" clause (*i.e.*, "including continuous or repeated exposure to substantially the same general harmful conditions").

In ordinary usage, "occurrence" carries a broader meaning than "accident." *Webster's* defines "occurrence" in part as follows:

"**1** : something that takes place; [especially] \* \* \* something that happens unexpectedly and without design \* \* \*"

*Webster's* at 1561.

Although an "occurrence" is therefore *often* unexpected, *see id.* (defining "occurrence" as "especially \* \* \* unexpected[]"), an "accident" is *necessarily* unexpected, *see Webster's* at 11 (defining "accident" as, in relevant part, "an unexpected happening"). "Occurrence" thus denotes something broader than "accident."

History explains the use of the broader term "occurrence" alongside the more specific term "accident" in CGL policies such as defendant's. Before 1966, CGL policies limited coverage to property damage caused by an "accident"—they made no reference to any "occurrence." Plitt *et al*, *Couch on Insurance* § 129:3 (3d ed 1995). Courts of that era construed "accident" narrowly, as a "sudden or abrupt event." *Id.* That narrow construction gave rise to a proposed modification of the standard coverage language. *Id.* To broaden coverage to "progressive or continuing injury situations," CGL policies were rewritten to include the term "occurrence," which, as in the CGL policy at issue in this case, was defined in relevant part as an "accident." *Id.*

But whether or not the term "occurrence" broadens what might otherwise be a covered "accident," neither the use of that term in the policy nor the reason for its addition says anything about how one establishes that the insured's liability arises from an "accident." That is, given our conclusion that an "accident" must arise from something other than solely the insured's contractual obligations, the fact that "accident" might be read broadly neither eliminates the

need to establish a noncontractual obligation to avoid property damage nor guides our determination as to how the breach of such an obligation is established.

The parties make similar arguments regarding the clause "including continuous or repeated exposure to substantially the same general harmful conditions," but again that context does not advance either side's argument. Like the term "occurrence," the phrase "continuous or repeated exposure" suggests that coverage for "accident[s]" is not limited to sudden or abrupt events, but it does not appear to otherwise clarify the meaning of "accident." And although, even in the absence of a contract, an insured presumably must avoid subjecting others to "continuous or repeated exposure to ∗∗∗ harmful conditions," that provision merely raises the same question in a slightly different way: How does an insured— or one standing in the place of an insured—establish that the insured's liability arises out of a separate obligation to avoid those harms, rather than merely out of the insured's obligations under the applicable contract, so as to bring the resultant damage within the terms of the CGL policy?

b.   The "broader context"

Because our examination of the "particular context" of the term "accident" does not resolve the remaining dispute about its meaning, we turn to the "broader context of the policy as a whole." *Hoffman*, 313 Or at 470. Again, the parties' focus is on whether "accident" incorporates tort principles at all, a question that *Oak Crest* resolves against plaintiffs. But at least one aspect of the CGL policy that plaintiffs identify bears discussion here.[10] Under the "Coverage A" subsection of the policy, defendant agreed that it would "pay those sums that the insured becomes legally obligated to pay as damages because of ∗∗∗ 'property damage' to which this insurance applies." The policy defines "property damage" in relevant part as "physical injury to tangible property." But other than the previously discussed requirement that the "property damage" be caused by an "occurrence" (during the

---

[10]  Plaintiffs did not identify the Coverage A subsection for its bearing on how an insured's liability is determined. Rather, plaintiffs point to several provisions under that subsection that, in their view, show that it is unnecessary to identify a tort-based theory of liability to recover under the "accident" provision of the policy. Nonetheless, we discuss the Coverage A subsection for its relevance here.

policy period), the policy does not further define or otherwise limit the phrase "legally obligated to pay as damages."

By its terms, that provision is focused on whether the insured is under a legal obligation to pay damages—under the terms of a judgment or otherwise—but it is ambiguous as to what must be shown to bring that obligation under its scope. On one hand, it does not expressly state that, if an insured is undisputedly under a legal obligation to pay damages for a breach of contract, coverage under the policy is dependent on proof that the insured has a separate legal obligation to pay damages in tort, even if they are identical damages. On the other hand, that same provision requires that the underlying legal obligation to pay damages be "because of *** 'property damage' to which this insurance applies." So, although somewhat circular in its cross-reference to the requirement of an "accident," the "because" clause can plausibly be read to require that the "legal[] obligat[ion] to pay damages" flows directly from the occurrence of an "accident," *i.e.*, that the legal obligation be in the form of a specific award of tort damages.

We conclude that the broader context of the policy as a whole neither strongly supports either side's interpretation of "accident" nor otherwise resolves that term's meaning. Thus, we turn to our prior case law to see whether it "can supply helpful contextual evidence of the intent that underlies the use of [that term] *** here." *See Gonzales*, 345 Or at 388 (considering this court's prior interpretations or the same or similar language as contextual evidence of contracting parties' intent). Again, *Oak Crest* is instructive.

As noted, in *Oak Crest* this court acknowledged that a party to a contract may be liable *both* for breach of the contract and for negligent performance of that party's obligations under the contract. 329 Or at 627. In that case, there was *no* underlying claim for damages by a third party; rather, the insured, after determining that its subcontractor's work had been faulty, spent approximately $10,000 to correct that work. *Id.* at 623. The insured then submitted a claim for reimbursement to its insurer, which denied the claim. *Id.* In the ensuing coverage litigation, the insurer argued that its insurance policy did not provide coverage

because its insured had not, and could not, "allege that this work was made necessary because of an accident." *Id*. at 624 (internal quotation marks omitted).

The trial court in *Oak Crest* granted summary judgment for the insurer, but on a somewhat different basis than the insurer had argued for. *Id*. at 624-25. On appeal, the Court of Appeals affirmed the trial court, relying on the insurer's argument that the damage at issue had not arisen from accidental means. *Id*. at 625. Finally, on review, this court again affirmed the trial court and, like the Court of Appeals, relied on the conclusion that the insured's liability arose from the insured's contractual obligations, not from an "accident." *Id*. at 628-29. Significantly, however, this court did not base its conclusion on any pleadings or trial court judgment:

> "We recognize, as we did in *Kisle*, that the same conduct might be actionable under both tort and contract theories. However, applying the foregoing principle to the facts in the summary judgment record in the present case, we conclude that, as alleged, plaintiff's claim arose solely from a breach of contract and, therefore, is not covered by the policy. Although the record establishes that plaintiff spent approximately $10,000 for the repair of a subcontractor's 'deficient' painting work, it cannot support a conclusion that the problem with the cabinetry and woodwork painting resulted from the subcontractor's breach of a duty to act with due care. *Had the facts demonstrated that the claimed problem \*\*\* was the result of that kind of breach, or that plaintiff might be liable to the owners in tort for some other damage, that might have qualified as an 'accident' with the meaning of the commercial liability policy. But plaintiff here failed to establish that that a question of fact existed in that regard,* as plaintiff was required to do to show that there had been a covered event under the policy."

*Id*. at 628-29 (footnote omitted; emphasis added). Thus, the court in *Oak Crest* did not view an "accident" as limited to a claim that has been pleaded or reduced to a judgment. Rather, the court appears to have understood that there must be some basis in the record from which it could be found that the claimed damage was the result of the insured's breach of a duty to act with due care.[11]

---

[11] In *Oak Crest*, of course, there was no opportunity for a formal allegation or adjudication of tort liability because the insured had already repaired the

Given that the *Oak Crest* court conducted a searching review of the record rather than merely relying on the lack of any underlying tort claim, we conclude that the requirement in defendant's CGL policy that property damage arise from an "accident" is at best ambiguous as to whether it requires that a plaintiff have pleaded or proved a tort claim. Indeed, *Oak Crest* directly supports plaintiffs' view that, if the underlying record could support a tort claim, then it does not matter whether the underlying claim was in fact prosecuted in tort, contract, or both. Further, because plaintiffs' interpretation aligns with this court's approach in *Oak Crest* and is thus plausible, we apply the final step of the *Hoffman* analysis in their favor. Under *Hoffman*, if the terms of an insurance policy remain ambiguous after a review of the parties' proposed interpretations, the terms and conditions of the policy, and any other applicable interpretive tools, the ambiguous terms "are to be construed against the insurer, who drafted the policy." *See Hoffman*, 313 Or at 469-70. Having reached the final step of *Hoffman* without resolving the ambiguity present in defendant's CGL policy, we must construe that ambiguity against defendant.

Applying that rule of construction, we conclude that, to establish the property damage alleged here was caused by an "accident" within the meaning of defendant's CGL policy, plaintiffs were not required to formally allege a tort claim or obtain an award in tort. Rather, plaintiffs were required to establish that there was a basis in fact for imposing tort liability on Rainier Pacific, even though the same facts may have established Rainier Pacific's liability in contract. We therefore turn next to whether plaintiffs have made that required showing here.

B.  *Application*

Based on its understanding of *Oak Crest*, the trial court concluded that plaintiffs had not raised a genuine issue of material fact with regard to Rainier Pacific's liability for an "accident" within the meaning of defendant's CGL

_____

defective work. 329 Or at 622. Thus, this court directly reviewed the underlying facts to assess whether they gave rise to tort liability or merely contract liability. *Id*. at 628. We see no reason why plaintiffs' filing of a claim against the insured might foreclose such an inquiry here.

policy. The trial court therefore granted defendant's motion for summary judgment and denied plaintiffs' cross-motion. Based on our own review of the summary judgment record—informed by the above understanding of what it means for an insured's liability to have a basis in tort—we conclude that the trial court erred in granting summary judgment to defendant. Accordingly, and for the reasons that follow, we reverse the trial court's grant of summary judgment and remand this case for further proceedings.

We begin with a preliminary observation. It is well settled that the mere fact that an insured was in a contractual relationship with a plaintiff does not foreclose the possibility of liability to that plaintiff in tort, in addition to contract. *Oak Crest* itself, in quoting *Kisle*, acknowledged that "[d]amage caused by the negligent performance of a contract can in certain instances be recoverable in tort." *Oak Crest*, 329 Or at 628 (internal quotation marks omitted); *see id.* (recognizing a "tort as a breach of a duty created by law and not necessarily by the agreement of the parties[,]" distinguishable from a "failure to perform a contract," which "is not recoverable in tort").

We have reiterated that principle more recently. For example, in *Abraham v. T. Henry Construction, Inc.*, 350 Or 29, 33, 249 P3d 534 (2011), the issue was "[w]hether a claim for property damage arising from construction defects may lie in tort, in addition to contract, when the homeowner and builder are in a contractual relationship." In that construction defect case, a homeowner had sued a builder for water damage, asserting both breach-of-contract and negligence claims based on alleged faulty workmanship and failure to comply with provisions of the building code. *Id.* The trial court granted summary judgment to the builder, reasoning that the homeowner had failed to establish a violation of a standard of care independent of the builder's contractual duties. *Id.* On review, this court first noted that physical injury to a building caused by construction defects constitutes property damage, as opposed to purely economic loss, and so can be actionable in negligence. *Id.* at 37 (citing *Harris v. Suniga,* 344 Or 301, 312, 180 P3d 12 (2008)). Then, referencing this

court's opinion in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987), we explained:

> "The contract's reference to performing the work 'in a workmanlike manner and in compliance with all building codes and other applicable laws' simply reiterated the common law negligence standard that would have applied to defendants' work in the absence of a contract."

350 Or at 38.

Ultimately, we held in *Abraham* that a party to a contract is not foreclosed from maintaining an ordinary negligence claim based upon the alleged failure to exercise reasonable care to avoid foreseeable harm unless the contract itself forecloses it. *Id.* at 40. Although we recognized that, ordinarily, a claim based solely on the breach of a provision of a contract will give rise only to contract remedies, we held that, where the other party is subject to a standard of care independent of those imposed by contract, then property damage resulting from a breach of that standard may be recovered in tort. *Id.* at 39-40.

Returning to this case, we do not understand defendant to argue that plaintiffs would have been foreclosed from pursuing a tort claim, whether for negligent performance of a contract or otherwise; defendant's argument is that plaintiffs did not pursue such a claim and that their failure to do so is fatal to their case. We agree, as plaintiffs themselves do, that plaintiffs did not explicitly pursue a tort claim in the arbitration proceeding or any other proceeding. We disagree, however, that plaintiffs' decision to expressly pursue only a breach-of-contract claim forecloses their claim for recovery under defendant's CGL policy.

This case comes before us on the trial court's grant of summary judgment to defendant.[12] On review, we must determine whether defendant, the party moving for summary judgment, has demonstrated "'that there is no genuine issue as to any material fact' and that it 'is entitled to

---

[12] Although, as previously noted, the trial court also denied plaintiffs' cross-motion for summary judgment, there were issues that the trial court found unnecessary to decide in light of its understanding of the term "accident." Because those other issues may arise again on remand, we do not decide whether the trial court erred in denying summary judgment to plaintiffs.

prevail as a matter of law.'" *Portfolio Recovery Associates, LLC v. Sanders*, 366 Or 355, 375, 462 P3d 263 (2020) (quoting ORCP 47 C). In reviewing whether defendant has met that burden, we "view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the nonmoving party," and, to uphold the grant of summary judgment, we must be able to conclude that "no objectively reasonable juror could return a verdict for" plaintiffs. *Id.* at 375-76 (internal quotation marks omitted).

Applying that standard here, we conclude that the trial court erred. As recounted in some detail above, 373 Or at 479-80, the record before the arbitrator (and the trial court on summary judgment) contained evidence that the Ardex's manufacturer provided specific instructions for its installation—together with explicit warnings regarding the likely consequences of failing to follow those instructions—that Rainier Pacific's subcontractor failed to follow those instructions, that cracks and voids emerged in plaintiffs' garage floor that were consistent with those warned of in the manufacturer's instructions, and that plaintiffs incurred damages as a result. There was additional evidence from which a finder of fact could find that Rainier Pacific falsely claimed that the Ardex's manufacturer approved the manner in which the Ardex had been installed. Collectively, the evidence was sufficient to raise a genuine issue of fact as to whether Rainier Pacific's subcontractor, by failing to follow the manufacturer's explicit installation instructions, despite the strong warning against exactly the harm that the garage floor ultimately suffered, unreasonably created a foreseeable risk of harm to plaintiffs and that they had incurred damages as a result.

Given that evidence in the summary judgment record, particularly when appropriately viewed in the light most favorable to plaintiffs, we readily conclude that defendant failed to demonstrate that there was no genuine issue of material fact or that it was entitled to prevail as a matter of law. ORCP 47C. That is, a factfinder could find, based upon that evidence, that plaintiffs' garage floor had been negligently installed and that plaintiffs incurred damages as a result. Thus, in light of our above conclusion regarding

the meaning of "accident" in defendant's CGL policy, the evidence was sufficient to preclude summary judgment on the ground that plaintiffs had failed to demonstrate that their damages were the result of an accident, *i.e.*, that there was a basis in tort to recover those damages. The trial court therefore erred in granting defendant summary judgment.[13]

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

[13] To be clear, we decide this case on the disputed issue regarding the meaning of "accident" in defendant's CGL policy and whether the trial court erred in granting summary judgment based on its understanding of that term. We do not decide whether, or the extent to which, the damages awarded to plaintiffs in the arbitration proceeding were for "property damage" under the terms of the policy or this court's tort law.