262 May 14, 2026 No. 25

IN THE SUPREME COURT OF THE
STATE OF OREGON

Kristina SHEPPARD,
*Petitioner on Review,*
*v.*
PROGRESSIVE CLASSIC INSURANCE COMPANY,
a foreign corporation,
*Respondent on Review,*
*and*
Eric McHENRY
and State of Oregon,
*Defendants.*

(CC 20CV28039) (CA A178724) (SC S071187)

En Banc

On review from the Court of Appeals.*

Argued and submitted April 17, 2025.

Derek Larwick, Larwick Law Firm, PC, Eugene, argued the cause and filed the brief for petitioner on review.

Jonathan Henderson, Davis Rothwell Earle & Xochihua, P.C., Portland, argued the cause and filed the brief for respondent on review. Also on the briefs was Christopher J. Drotzmann.

David E. Smith, Spooner Staggs Trial Lawyers, Salem, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Brian C. Hickman, Gordon & Polscer, L.L.C., Tigard, filed the brief for *amicus curiae* American Property Casualty Insurance Association.

DeHOOG, J.

_____
\* Appeal from Marion County Circuit Court, James C. Edmonds, Judge. 333 Or App 39, 551 P3d 967 (2024).

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**DeHOOG, J.**

Under Oregon law, automobile liability policies must provide insured motorists with coverage for, among other things, bodily injury or death resulting from accidents caused by uninsured or underinsured motorists. *See* ORS 742.504 (uninsured motorist coverage); ORS 742.502 (underinsured motorist coverage). However, coverage is not required for bodily injuries an insured suffers while "occupying a vehicle * * * furnished for the regular use of[] the named insured[.]" ORS 742.504(4)(b). Plaintiff was injured by another motorist while plaintiff was driving a vehicle that her employer had provided for her work-related use. Plaintiff's damages exceeded the combined limits of the other motorist's and her employer's insurance policies, so she sought underinsured motorist coverage from her own insurer, defendant in this case. Defendant denied plaintiff's claim. It asserted that plaintiff was not entitled to coverage, because, in its view, the vehicle she was driving at the time of the accident had been "furnished for [her] regular use." Plaintiff sued to recover those benefits, but, on the parties' cross-motions for summary judgment, the trial court agreed with defendant. The court therefore granted defendant's motion, denied plaintiff's cross-motion, and dismissed plaintiff's claim. The Court of Appeals affirmed. *Sheppard v. Progressive Classic Ins. Co.*, 333 Or App 39, 551 P3d 967 (2024) (holding that defendant was entitled to summary judgment because plaintiff's employer had furnished work vehicle for her regular use). On review, we conclude that disputed issues of fact in this case preclude the determination that, as a matter of law, the vehicle that plaintiff was driving had been "furnished for [her] regular use" within the meaning of ORS 742.504(4)(b); the trial court therefore erred in granting summary judgment to defendant. We further conclude, however, that plaintiff also has not shown that she, instead, was entitled to summary judgment on that issue. We therefore reverse the Court of Appeals' decision, reverse the judgment of the trial court, and remand to that court for further proceedings.

## I.   BACKGROUND

A.   *Legal and Procedural Posture*

This case involves two aspects of a typical automobile liability policy: uninsured motorist coverage and underinsured motorist coverage. In general, those components of an automobile policy cover loss to an insured who suffers bodily injury or death due to a motor vehicle accident caused by another person, if the person at fault either has no liability insurance (an uninsured motorist), or has liability insurance insufficient to cover the damages the insured has incurred (an underinsured motorist). *See* ORS 742.504 (uninsured motorist coverage); ORS 742.502 (underinsured motorist coverage); *see also Batten v. State Farm Mutual Automobile Ins. Co.*, 368 Or 538, 542, 495 P3d 1222 (2021) (summarizing framework).

Plaintiff, a state employee, brought this civil action against defendant insurer to obtain underinsured motorist coverage through her personal automobile insurance policy. She alleged that she had been in an accident while driving a work vehicle owned by the State of Oregon; that she had suffered damages as a result of the accident; and that those damages exceeded the policy limits of the other driver and of the state. She asserted that defendant, who had issued the insurance policy on her personal vehicle, was required to cover the excess damages up to her policy limits.

Defendant moved for summary judgment, contending that, due to an exclusion in plaintiff's policy, she was not entitled to underinsured motorist benefits. Specifically, Part III of the policy, which governs accidents involving uninsured or underinsured motorists, provides:

"Coverage under this Part III will not apply:

"1.   to bodily injury sustained by any person while occupying or being struck by a motor vehicle that is owned by or furnished for the regular use of you, a relative, or a rated resident.

"This exclusion does not apply to a covered auto that is insured under this Part III[.]"

(Emphases omitted.) That exclusion is authorized by statute. ORS 742.504(4)(b).[1] Defendant argued that the work vehicle in which plaintiff sustained her injuries had been "furnished for [her] regular use" within the meaning of the exclusion, making the policy's underinsured motorist coverage inapplicable to plaintiff's accident. In a cross-motion for partial summary judgment, plaintiff raised the same issue, arguing that the restrictions that were placed on her use of the work vehicle meant it had not been "furnished for [her] regular use." The parties supported their respective motions with exhibits and deposition testimony.

After a hearing, the trial court granted defendant's motion for summary judgment and denied plaintiff's cross-motion. Plaintiff appealed both aspects of the trial court's rulings, and the Court of Appeals affirmed.[2] We allowed review to consider the meaning of "furnished for the regular use" when used in an automobile insurance policy.

B.   *Facts Regarding Plaintiff's Use of a Work Vehicle*

The relevant facts are those submitted by the parties in their respective summary judgment filings. When reviewing a grant of summary judgment, we typically set out the facts in the light most favorable to the nonmoving party. *See* ORCP 47 C; *Moore-Reed v. Griffin*, 374 Or 596, 598, 581 P3d 949 (2025). Because we begin our analysis by considering whether the trial court erred in granting summary judgment to defendant, we first set out the facts in the light most favorable to plaintiff, the nonmoving party. However, when we turn to plaintiff's cross-motion, we will discuss whether any additional facts, when viewed in *defendant's* favor, precluded summary judgment on behalf of plaintiff.

---

[1] Although this case involves underinsured motorist coverage, the requirements of ORS 742.504 regarding uninsured motorist coverage equally apply. *See* ORS 742.502(4) ("Underinsurance coverage is subject to ORS 742.504[.]").

[2] Because the Court of Appeals had concluded, as a matter of law, that plaintiff's work vehicle had been furnished for her regular use, it affirmed the grant of summary judgment to defendant (*Sheppard*, 333 Or App at 45); it therefore necessarily rejected plaintiff's argument that she was entitled to partial summary judgment on that issue. As we will explain, we conclude that the summary judgment record discloses disputed issues of fact that preclude an award of summary judgment to either party, and we remand this case to the trial court for it to resolve those remaining factual disputes.

As noted, plaintiff was injured driving a vehicle that her employer had authorized her to use for work purposes, and the question on review is whether plaintiff's employer had "furnished [it] for [her] regular use" within the meaning of the exclusion for such vehicles. We therefore begin by examining plaintiff's work duties and her related authorization to use the work vehicle that her employer provided.

Plaintiff worked in the Roseburg office of the Oregon Department of Forestry (ODF), holding the position of Executive Support Specialist 2. She had held that position since December 2011. The position summary for plaintiff's job described it as largely an office position that involved administrative, management, and secretarial functions. The position could require "infrequent" travel for administrative work related to active wildfire operations.

The Roseburg office had a total of 8 or 9 state-owned vehicles. Most of the employees at the Roseburg office had field duties, so they had work vehicles specifically assigned to them. Employees with assigned vehicles would keep a key to their vehicle.

Plaintiff was not one of those employees. From ODF's perspective, plaintiff used a work vehicle so infrequently that it was unnecessary for ODF to assign her a vehicle. Instead, plaintiff's usual only option was to use the one shared, or "floating," vehicle available at the Roseburg office: a specific Chevy Silverado pickup truck, which was the vehicle that she was driving at the time of her accident.[3] The Silverado was a marked state vehicle that was equipped for off-road travel.

Plaintiff was not required to specifically obtain her supervisor's permission each time that she used the Silverado. It was "okay" with plaintiff's supervisor for plaintiff to use the Silverado "*as needed* without having to ask permission." (Emphasis added.) But, because the Silverado was not assigned to plaintiff, she did not have her own key and had to get it from her supervisor whenever she checked the truck out.

---

[3] Plaintiff occasionally borrowed another employee's assigned work vehicle if her work required her to drive and the assigned employee did not need the vehicle that day. The record does not indicate how frequently that might occur or what those work assignments might be.

The record contains very little evidence of how frequently plaintiff used any work vehicle, and almost all the available evidence relates to the Silverado. There is no evidence that plaintiff used any work vehicle between her start date in 2011 and her first recorded use of the Silverado in June 2017. There are 61 months of records showing the Silverado's use prior to the accident; they indicate that plaintiff used it during only six of those 61 months: June, August, and September 2017, and May, July, and August 2018.

The only evidence of plaintiff's work travel involved fire assignments.[4] Because fire assignments were not an official aspect of plaintiff's work position, those assignments were not simply infrequent; they also were contingent and, it seems, optional. According to plaintiff's supervisor, if the team handling a particular wildfire concluded that they needed additional personnel having certain qualifications, that team would contact ODF's coordination center. The coordination center would identify employees with the appropriate qualifications, then contact each employee's supervisor to "ask if that [employee] may be available for an assignment." "[T]he supervisor would usually talk to the employee and ask if they're available, interested, and if they are, work it out." Plaintiff's supervisor followed that practice with plaintiff.

The mileage records maintained by the state do not indicate how many days plaintiff used the Silverado during each of the months in which she used it, but her own testimony was that the average length of time that she spent at a fire assignment was 14 days. The records show that plaintiff drove the Silverado a total of 4,532 miles during those months.

Plaintiff was permitted to use a work vehicle only for work purposes, not for any personal reason. When plaintiff was assigned to a fire, however, the permitted uses expanded somewhat because she was on "travel status." At those times, in addition to driving from her home duty station to the fire and back, plaintiff was allowed to drive the truck to take

---

[4] Plaintiff's job summary indicated that she could be required to travel to and from meetings in other offices, and it is possible that some of plaintiff's use of the Silverado related to those duties. We note again, however, that the record lacks evidence as to when or how often plaintiff might have used any work vehicle for any reason other than her recorded use in 2017 and 2018.

care of basic necessities such as refueling the truck, buying food for herself, and getting to and from her nightly lodging.

Plaintiff's accident occurred while she was using the Silverado in an authorized manner. She had been assigned to a fire and had been using the truck for at least two days. The accident itself occurred while she was driving to her lodging for the night. As a result of the accident, plaintiff incurred damages exceeding the policy limits for both the other driver and ODF, and it is not disputed that their insurers have paid plaintiff those full policy limits.[5] The facts and nature of the accident are otherwise not relevant to this case.

## C.   *The Court of Appeals' Decision*

After the trial court granted summary judgment to defendant, plaintiff appealed, and the Court of Appeals affirmed. *Sheppard*, 333 Or App 39. The Court of Appeals had previously held that, in determining whether a vehicle was "furnished for regular use," the key inquiry was whether an insured enjoyed the right to the regular use of a vehicle, and not the manner in which they were permitted to use it. *See id.* at 44-45 (discussing *North Pacific Ins. Co. v. Anderson*, 110 Or App 269, 821 P2d 444 (1991)). Thus, although plaintiff emphasized the limits on how she could use the truck, the Court of Appeals regarded those limits as immaterial. *Id.* at 44. Instead, the court explained:

> "[P]laintiff's supervisor testified that plaintiff could use the truck whenever she needed, without having to ask for permission. The evidence establishes that she did in fact regularly use the truck, logging nearly 5,000 miles on the truck in just over a year. The truck was furnished to plaintiff for her regular use *because she had a right to use it for work purposes whenever she wanted.*"

*Id.* at 45 (emphasis added).

Plaintiff sought review, which this court allowed.

---

[5] Plaintiff alleges total damages of up to $150,000. The other driver's insurer paid the full amount of its liability policy limit, $25,000. The state also paid the full amount of its underinsured motorist policy limits, $25,000. Plaintiff's action against defendant sought the full amount of her remaining alleged damages, up to the $100,000 policy limit for underinsured motorist coverage. Although the actual amount of damages remains in dispute, we assume for purposes of defendant's summary judgment motion that they at least exceeded the combined coverage available under the other policies.

## II.   DISCUSSION

### A.   *Standard of Review*

Because the trial court granted summary judgment for defendant, we must determine whether defendant has shown "that there is no genuine issue as to any material fact" and that defendant "is entitled to prevail as a matter of law." ORCP 47 C; *see, e.g.*, *Twigg v. Admiral Ins. Co.*, 373 Or 445, 473-74, 568 P3d 156 (2025). We will affirm the grant of summary judgment only if "no objectively reasonable juror could return a verdict for" plaintiff. ORCP 47 C. Here, if an objectively reasonable juror could find that the work vehicle that plaintiff was driving at the time of her accident was *not* "furnished for [her] regular use" within the meaning of defendant's insurance policy, then summary judgment for defendant was not appropriate. We turn to that inquiry.

### B.   *"Furnished for the Regular Use"*

To determine whether there is a genuine question of fact regarding the "furnished for the regular use" exclusion, we must first determine what that phrase means. As we discuss below, although that phrase appears in defendant's automobile insurance policy, it tracks the statutory minimum coverage provisions that govern Oregon insurers, as well as the uninsured and underinsured motorist benefits that their policies must provide. Thus, even though we discuss that phrase both as it appears in defendant's insurance policy and in the underlying statute, because it is undisputed that the phrase as used in the policy has the same meaning as it does in the statute, our decision here ultimately turns on what we conclude the legislature intended by that phrase.

#### 1.   *History of "furnished for the regular use" exclusion*

As historical context, we note that the "furnished for the regular use" exclusion did not originate under Oregon law, nor was it limited to uninsured motorist or underinsured motorist coverage. Automobile insurance policies nationwide have included the phrase for the better part

of a century; the earliest reported opinion that we are aware of is a Maine decision from 1941.[6]

Automobile insurance policies commonly use the phrase in two different contexts. The first is as an exclusion from coverage for liability: A policy will state that the policy does not cover liability as to any vehicle that is not expressly covered and that is either owned by the insured or "[f]urnished or available for [the insured's] regular use." William J. Schermer and Irvin E. Schermer, 1 *Automobile Liability Insurance* § 6:10 (4th ed Westlaw, updated Nov 2025) (describing that text as "typical"). The second use is as an exclusion from underinsured motorist coverage similar to the exclusion here—such policies will often exclude from the definition of "underinsured motor vehicle" any vehicle "owned by [the insured] or a relative or furnished for the regular use of [the insured] or a [resident] relative." Schermer and Schermer, 3 *Automobile Liability Insurance* § 39:6.

Dozens of reported decisions have been decided since the insurance industry first began using the phrase in policies. *See* Schermer and Schermer, 1 *Automobile Liability Insurance* § 6:10 (collecting cases as to exclusion for liability coverage); *id.* at 3 *Automobile Liability Insurance* § 39:6 (collecting cases regarding exclusion as to uninsured motorist and underinsured motorist coverage); David B. Harrison, *When is automobile furnished or available for regular use within "drive other car" coverage of automobile liability policy*, 8 ALR 4th 387 (Westlaw, originally published 1981) (collecting cases generally); Curtis M. Elliott, *The Insurance Definition of Automobile*, 1967 Ins LJ 596, 603-06 (1967) (discussing major decisions to date); Fred D. Cunningham, *Use of Other Automobiles*, 21 Ins Counsel J 137, 139-40 (1954) (discussing major decisions to date).

Despite the extensive case law, those opinions provide limited guidance. If there is a consensus about the case law, it appears to be that "furnished for the regular use" has no single, clearly defined meaning. Harrison, 8 ALR 4th 387,

---

[6] *Lumbermens Mut. Cas. Co. v. Pulsifer*, 41 F Supp 249 (D Me 1941). That court noted, "The clause in question seems to be one only recently in vogue and I find no decisions precisely in point." *Id.* at 251.

§ 2 ("a specific and universally applicable definition of the phrase 'furnished or available for regular use' is lacking");[7] Elliott, 1967 Ins LJ at 603-04 ("What constitutes 'furnished for regular use' or 'furnished or available for regular use' has long been a source of dispute."); Cunningham, 21 Ins Counsel J at 139 (noting the "inconsistent interpretations of this phrase of the exclusion" by courts, and stating that "[t]hese conflicting decisions appear to be irreconcilable and may perhaps be only distinguished by the particular facts of each case"); *see, e.g.*, *Brouillette v. Fireman's Fund Ins. Co.*, 163 So 2d 389, 391 (La Ct App 3d Cir), *cert den*, 246 La 594, 165 So 2d 485 (1964) ("the application of the exclusion is a question of fact, with no hard and fast rule established to determine such question, which depends upon an examination of the facts in each case according to the general criteria of the terms used"); *Home Ins. Co. v. Kennedy*, 52 Del 42, 47, 152 A2d 115, 118 (1959) ("No absolute definition can be established for the term 'furnished for regular use.' Each case must be decided on its own facts and circumstances."); *Farm Bureau Mut. Auto. Ins. Co. v. Marr*, 128 F Supp 67, 68 (DNJ 1955) ("a reading of the cases discloses that no hard and fast rule has been nor in the opinion of this Court can be established for determining this question but that each case must stand or fall upon examination of the facts in the particular case before the Court"); *Pac. Auto. Ins. Co. v. Lewis*, 56 Cal App 2d 597, 600, 132 P2d 846, 848 (1943) (noting "the rather broad and not very explicit language used in these policies to set forth the exception to the coverage otherwise provided").

### 2.   *Interpretation of ORS 742.504(4)(b)*

Another factor potentially limits the guidance that those other cases can provide here. In the typical insurance coverage case, the primary goal is to determine the intent of the parties to an insurance contract. *See, e.g.*, *Twigg*, 373 Or at 456 ("In interpreting the terms of an insurance policy, our primary goal is to ascertain the intention of the parties, as reflected in the terms and conditions of the policy."). In

---

[7] The Harrison annotation adds that the other terms often used by courts to interpret "furnished for regular use"—"casual" and "infrequent," as distinguished from "steady," "constant," and "ordinary"—"are as difficult to define with specificity as the latter phrase itself." 8 ALR 4th 387, § 2.

this case, however, we are not called upon to interpret the text of an insurance policy. Instead, we must interpret the statute that governs the policy term at issue, ORS 742.504.

That conclusion is due to the nature of ORS 742.504, which mandates the inclusion of uninsured and underinsured motorist coverage in automobile insurance policies. ORS 742.504 prescribes "a comprehensive model" policy for uninsured motorist coverage. *Vega v. Farmers Ins. Co.*, 323 Or 291, 302, 918 P2d 95 (1996) (so describing ORS 742.504). The model policy set forth under that statute represents the minimum coverage; that is, an actual policy must provide coverage at least as favorable to the insured as the model, though it may be more favorable by providing more than the minimum coverage. *See id.* (stating that terms "that disfavor insureds may be excluded or softened and extraneous terms that are neutral or that favor insureds may be added"). If any policy term is less favorable to the insured than the model policy, then that term is unenforceable. *See id.* at 303 (noting as much); *Erickson v. Farmers Ins. Co.*, 331 Or 681, 685, 21 P3d 90 (2001) (same).

Plaintiff here acknowledges that the relevant policy provisions provide coverage that, in substance, meets all the requirements of ORS 742.504. Further, plaintiff does not contend that the relevant policy provisions provide broader coverage. Accordingly, the parties (like the Court of Appeals) agree that the appropriate focus is on ORS 742.504, rather than on the text of this particular insurance policy. We likewise agree that, because it is undisputed that the coverage that the policy provides is the coverage that ORS 742.504 requires, the proper focus of our inquiry is on the intended meaning of the statute. *See Perez v. State Farm Mutual Ins. Co.*, 289 Or 295, 299, 613 P2d 32 (1980) (so concluding regarding the personal injury protection coverage required by statute for motor vehicle insurance policies).[8]

---

[8] In *Perez*, this court addressed the personal injury protection (PIP) coverage given by an automobile insurance policy. 289 Or at 297. By statute, an insurer was (and is) required to give a certain minimum coverage. *Id.* at 297-99 (construing predecessor to ORS 743.520). Because the particular policy at issue had been intended to provide the statutory minimum, this court held that the scope of that coverage was determined by the meaning of the statute, not by the particular words of the policy:

With that understanding in mind, we turn to the meaning of ORS 742.504. To inform that inquiry, we apply our familiar method of statutory interpretation, seeking to determine the legislature's intent, of which the statutory text and context are the best evidence. *E.g.*, *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). To the extent that we find it helpful, we also will consider the available legislative history, giving it the weight we deem appropriate. *Id.* at 171-72.

The dispute between the parties turns on whether the work vehicle that plaintiff was driving had been "furnished for [her] regular use," such that the policy exclusion applied. As noted, defendant's policy denies uninsured and underinsured motorist coverage for "bodily injury sustained by any person while occupying or being struck by a motor vehicle that is owned by or furnished for the regular use of[,]" in relevant part, the insured person.[9] That provision tracks—both textually and in intended meaning—the following statutorily authorized exclusion:

> "This coverage does not apply to bodily injury to an insured while occupying a vehicle, other than an insured vehicle, owned by, *or furnished for the regular use of, the named insured* or any relative resident in the same household[.]"

ORS 742.504(4)(b) (emphasis added). Plaintiff did not own the Silverado, and it was not owned by or furnished for the use of any relative residing in plaintiff's household. Thus, the relevant statutory text, like the relevant policy language, is that emphasized above: "furnished for the regular use[.]"

---

"Although plaintiff relies on the terms of the policy, she does not point to anything in its language suggesting that the coverage provided was different from the minimum required by statute. Although the arrangement of the policy provisions varies slightly from that of the statute, the dispositive language is virtually identical. We find no indication of an intention to provide broader coverage than the statute requires. As did the Court of Appeals, we therefore approach the issue as a problem of statutory construction."

*Id.* at 299. As a consequence, the interpretive maxim ordinarily used for insurance policies—that ambiguities would be resolved in favor of coverage—did not apply. *Id.* at 299 n 2.

[9] The exclusion does not, of course, apply to any vehicles expressly covered under the policy, such as plaintiff's personal vehicle.

In interpreting statutory text, we typically presume, at least initially, that the legislature intended to give words of common usage their ordinary meanings. *E.g.*, *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).[10] Here, there are three such words: "furnish," "regular," and "use."

We begin with "use." The relevant definition of "use," when, as here, it is used as a noun, would appear to be the following:

> "**3 a :** the privilege or benefit of using something <offered him the ~ of his pen for signing> <had the ~ of the usual class time for study> <nor shall private property be taken for public ~ without just compensation—*U.S. Constitution*> <the Lord bless this food to our ~, and us to His service—*Bk. of Com. Worship*>"

*Webster's Third New Int'l Dictionary* 2523 (unabridged ed 2002).[11]

---

[10] Plaintiff contends that the term "regular use" has a well-defined legal meaning that we should use here. Plaintiff relies on the definition of "regular use" found in the 2009 edition of *Black's Law Dictionary*. *See Black's Law Dictionary* 1682 (9th ed 2009) (under entry for "use," defining "regular use" as "[a] use that is usual, normal, or customary, as opposed to an occasional, special, or incidental use").

Plaintiff's general proposition is correct: When there is evidence that the legislature intended to use a term of art, we typically apply that definition. *See State v. Williams*, 374 Or 648, 657, 582 P3d 637 (2025) (noting proposition and citing cases); Jack L. Landau, *Oregon Statutory Construction*, 97 Or L Rev 583, 661-65 (2019) (discussing cases). But "we attempt to determine what the legislature actually intended *at the time of enactment*," so we consider "dictionaries that are contemporaneous with the time of enactment when determining the ordinary meaning of a statutory word or phrase." *OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 592-93, 341 P3d 701 (2014) (emphasis in original). We are not persuaded that the legislature that enacted ORS 742.504(4)(b) had that meaning of "regular use" in mind. The definition that plaintiff offers dates to 2009— long after the legislature had enacted what is now ORS 742.504(4)(b). The edition of *Black's* that existed in 1967—the fourth edition, 1951—did not define the term. The term does not appear in *Black's* until the seventh edition, published in 1999.

[11] Unlike defendant's reliance on the 2009 edition of *Black's*, our reliance on the 2002 edition of *Webster's* should raise no concerns. The main text of *Webster's* is essentially unchanged since 1961; thus, "any version of *Webster's Third*—regardless of its copyright date—provides a relevant source of ordinary meaning for statutes enacted any time after 1961, if not earlier." *State v. Eastep*, 361 Or 746, 751 n 2, 399 P3d 979 (2017) (explaining that "[a]ny new definitional material since 1961 appears in an addendum section at the beginning of each republication").

For the exclusion to apply, the furnished "use" of a vehicle must be "regular." The most relevant definition of the adjectival form of "regular" appears to be

"**3 a :** steady or uniform in course, practice, or occurrence **:** not subject to unexplained or irrational variation **:** steadily pursued **:** ORDERLY, METHODICAL <~ habits> **b (1) :** returning, recurring, or received at stated, fixed, or uniform intervals <a ~ income> <in the ~ course of events>"

*Webster's* at 1913. Thus, the term "regular use" can have different connotations, as the court observed in *Hartford Acci. & Indem. Co. v. Hiland*, 349 F2d 376 (7th Cir 1965): It "may be used in the sense of time, for example, steady as opposed to occasional[,] or in the sense of type of use, usual as against unusual." *Id.* at 377-78 (rejecting district court's interpretation of "regular use" as focusing on an insured's "own use *** on a normal or usual basis" (internal quotation marks omitted)).

Finally, the vehicle must have been "furnished" for that regular use. The relevant definition of the verb "furnish" seems to be

"**1 a :** to provide or supply with what is needed, useful, or desirable **:** EQUIP <'tis now but four o'clock. We have two hours to ~ us—Shak.>"

*Webster's* at 923.

Thus, applying the plain meaning of those three words here suggests that a vehicle is one that has been "furnished for [one's] regular use" if someone has provided or supplied another person with the privilege or benefit of using it, either as a "steady" or "uniform" practice or at "stated, fixed, or uniform" intervals. And although the plain meaning of "regular" does not require absolute rigidity—*see Webster's* at 1913 (recognizing that "regular" matters may be subject to some variation, just not "unexplained or irrational variation")—it would, at a minimum, appear to exclude vehicles furnished merely on an incidental or ad hoc basis.

Looking to context for further indications of what the legislature intended by ORS 742.504(4)(b), we first note that, before the legislature enacted that paragraph's statutory predecessor, this court had issued an opinion in which

it interpreted the phrase "furnished for regular use." *See Wallace Co. v. State F. M. Auto. Ins. Co.*, 220 Or 520, 349 P2d 789 (1960) (seeking to determine the meaning of "furnished for regular use" as used in automobile insurance policy; focusing on intent of insurer and insured). This court's preexisting decisions can provide evidence of what the legislature intended its enactments to mean. *OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 593, 341 P3d 701 (2014) ("Court decisions that existed at the time that the legislature enacted a statute—and that, as a result, it could have been aware of—may be consulted in determining what the legislature intended in enacting the law as part of the context for the legislature's decision."). Because *Wallace* represents the only relevant decision issued by this court prior to the adoption of what is now ORS 742.504—and because the parties disagree on what lessons we should draw from it—we now consider that opinion in some detail.[12]

*Wallace* involved an exclusion from the liability provisions of an automobile insurance policy rather than underinsured motorist coverage. There, the insured's wife had been in an accident while driving a "loaner" vehicle that an auto dealer had given the insured to use while the insured's own vehicle was being repaired. 220 Or at 522. The evidence was unclear as to how long the insured was permitted to use the loaner, "but whether it was to be four days or two weeks [was], in our opinion, entirely immaterial to the issue presented." *Id.*

In subsequent insurance-coverage litigation regarding the insured's personal automobile policy, the issue was whether that policy provided coverage for the accident that the insured's wife had been in while driving the loaner

---

[12] Both the briefing of the parties and the Court of Appeals' opinion reference this court's decision in *Shadbolt v. Farmers Insur. Exch.*, 275 Or 407, 551 P2d 478 (1976), but that opinion is not helpful here. The court in *Shadbolt* was not interpreting ORS 742.504(4)(b), nor would that opinion have been available to the legislature that enacted the first version of that statute in 1967 (Or Laws 1967, ch 482, § 3(4)(b)). Instead, *Shadbolt* interpreted a provision of an insurance policy involving vehicles that the insured had "'regularly or frequently used.'" 275 Or at 409. The *Shadbolt* opinion expressly distinguished that policy clause from the clause interpreted in *Wallace*. *See id.* at 410 ("in *Wallace*, the issue was not whether the automobile was, in fact, 'regularly or frequently used' by the insured, as in this case, but whether the automobile was *furnished* for regular use" (emphasis in original)).

vehicle. The policy covered some replacement vehicles, but it excluded "'any automobile owned by \* \* \* or furnished for regular use to'" the insured or a member of the same household. *See id.* at 522-23 (quoting policy). At trial, the jury was instructed at some length regarding the meaning of the phrase "[f]urnished for regular use," including as follows:

> "'Furnished for regular use as used in the policy of insurance in question means a vehicle furnished for principal use as distinguished from a casual use. That is, furnished for regular use, used in the same or similar manner and for the same and similar purposes and at the usual time as the car that is actually owned by the party using the same.'"

*Id.* at 524 (quoting jury instruction).

In determining whether the trial court had correctly instructed the jury regarding the meaning of "furnished for regular use," this court did not focus on the specific text of that phrase. Instead, the court explained that "furnished for regular use" was to be interpreted in light of its underlying purpose. *Id.* at 525. The court gleaned that purpose from the policy's benefits and premiums and the relationship of the exclusion to both. *Id.* at 525-26. The court evidently reasoned that it would make no sense for the policy to identify which vehicles it covered and assess a corresponding premium, only to provide additional coverage for other vehicles that the insured might own or use at will, but for which no premium had been paid. As the court explained, the policy's design

> "'would seem to indicate the intention of the [insurer] to protect itself from a situation where an insured could pay for one policy and be covered by the insurance in driving any car that he decided to use, whether owned by him or members of his family or rented. In other words, cars under his control that he could use at will and might use often. Without some such exclusion it is obvious that the [insurer] might lose premiums and also that the hazard under the insurance would be increased.'"

*Id.* at 525-26 (quoting *Lumbermens Mut. Cas. Co. v. Pulsifer*, 41 F Supp 249, 251 (D Me 1941)). Thus, the purpose of the exclusion was to protect the insurer against a combination

of lost premiums and increased insurance risk, which would occur if an insured were able to pay for insurance on one vehicle, but effectively receive coverage for another that the insured "could use at will and might use often." *Id.* at 526.

The court went on to explain, however, that the "furnished for regular use" exclusion did not pursue that goal at all costs. The policy as a whole was intended to cover vehicles that "the insured or his wife might perhaps on infrequent occasions obtain permission of various owners to use." *Id.* at 526. The exclusion was intended only "to eliminate the risk to the insurer of the use of automobiles usually at hand instead of [the insured's] own [vehicle]." *Id.* Therefore, "it seem[ed] obvious that the clause implie[d] a restriction upon the use of automobiles over which the insured ha[d] a rather permanent right of control." *Id.*

Based on that understanding, the court explained that the phrase "furnished for regular use" focused on the right that the insured had to use a vehicle, not the particular manner in which the insured actually used it:

> "We are of the opinion, therefore, that the phrase 'furnished for regular use' as used in context does not imply the manner of use, that is, putting the automobile to the same uses to which an insured would use his own automobile, but implies a right to the regular use of the automobile in the sense that there is an expressed or implied understanding with the owner of an automobile that the insured could have the use of the particular automobile or perhaps any automobile of the other at such times as he desired, if available."

*Id.*

The court also explained that "furnished for regular use" would not apply to some situations in which the right to use the vehicle was too limited by purpose or by time:

> "The term 'furnished for regular use' does not embody the term 'for temporary use,' but describes the antithesis thereof. It, therefore, expresses no thought of excluding protection in those situations where the use is but for a single occasion or single purpose."

*Id.*

The court then returned to the challenged jury instruction. Again, the trial court had instructed the jury that "furnished for regular use" meant "furnished to be 'used in the same or similar manner and for the same and similar purposes and at the usual time as the car that is actually owned by the party using the same.'" *Id.* at 527 (quoting jury instructions). Given the court's interpretation of the insurance policy, it held that the instruction misstated the law:

> "This wording gives emphasis to the manner of use and not to the understanding of the [insured] as to the temporary or more or less permanent use of the automobile when available[.]"

*Id.*

Our interpretation of "furnished for regular use" in *Wallace* provides additional depth to the ordinary meaning of that phrase, and it informs our understanding of how the legislature that enacted ORS 742.504(4)(b) likely understood it. The phrase should be understood in light of its purpose, which is to protect insurance companies against both loss of premiums (due to motorists obtaining double coverage under their private policies) and increased insurance risk. The primary effect is to exclude coverage when an insured "pay[s] for one policy" but drives other vehicles "under [the insured's] control that he could use at will and might use often." 220 Or at 525-26 (internal quotation marks omitted); *see id.* at 526 (exclusion was intended only "to eliminate the risk to the insurer of the use of automobiles usually at [the insured's] hand" in place of the insured's own). That provision should not, however, be understood to exclude coverage when an insured is driving a vehicle that the insured might, "on infrequent occasions," receive permission to use. *Id.* at 526.

Thus, when determining whether a vehicle has been furnished for regular use, the central focus of that inquiry must be on the insured's right to use the vehicle; the manner or extent to which the insured actually exercised that right is not dispositive. *Id.* at 526-27 (focus is properly on insured's "right to the regular use of the automobile"; exclusion is not narrowly limited to those circumstances in which vehicle

was "'used in the same or similar manner and for the same and similar purposes and at the usual time'" as insured's covered vehicle, as that improperly emphasizes "manner of use"); *see also* Elliott, 1967 Ins LJ at 604 ("the right of use is apparently more important to the courts than the number of times the insured actually used the furnished automobile" (footnote omitted)).

We further note that *Wallace* specifically informs the meaning of "regular" as it appears in the statutory exclusion. *Wallace* explained that a vehicle made available only on an "infrequent" basis would fall outside the exclusion, whereas one that an insured has the right to use "often" would fall within it. *Id.* at 526. By making such a distinction, *Wallace* signaled that the right to "regular use" means more than merely the right to use on any uniform basis, such as, for example, once every quarter to pick up the CEO at the airport. Instead, the insured's right to use the vehicle—even if not actually exercised—must arise with some degree of frequency or even "often."

Although that understanding of *Wallace* and its implications for the meaning of ORS 742.504(4)(b) lends some support to plaintiff, it does not go as far as she contends. Plaintiff's proposed interpretation of "furnished for the regular use," which is based on her reading of *Wallace*, is that the exclusion applies only when an insured has "unrestricted rights to use the vehicle, *i.e.*, *de facto* ownership." Plaintiff reads *Wallace* "to require insureds to add all the vehicles that they own or have regular use of to their policy and to prevent the insured from getting the benefit of coverage on two vehicles while paying premiums for just one." In support of that view, plaintiff notes that *Wallace* twice used the word "permanent" in describing vehicles that would be subject to the exclusion because they were "furnished for regular use." *See* 220 Or at 526 ("the clause implies a restriction upon the use of automobiles over which the insured has a rather permanent right of control"); *id.* at 527 (question turns on "the understanding of the [insured] as to the temporary or more or less permanent use of the automobile when available"). Although plaintiff recognizes that "furnished for the regular use" denotes something less

than actual ownership, she reads *Wallace* as requiring the insured to have such complete control over the vehicle that they could obtain their own insurance for it.

Plaintiff identifies nothing in the text of the statute to suggest that "furnished for the regular use" means "unrestricted rights to use the vehicle" or "*de facto* ownership," and we do not read *Wallace* as suggesting that interpretation to the legislature. Although that opinion did mention "permanent" when discussing what would trigger the exclusion, it summarized its understanding of "furnished for regular use" more broadly, without referring to permanent control, much less to an insured's ability to add another vehicle to their insurance policy. As noted, the court stated:

> "We are of the opinion, therefore, that the phrase 'furnished for regular use' as used in context *** implies a right to the regular use of the automobile in the sense that there is an expressed or implied understanding with the owner of an automobile that the insured could have the use of the particular automobile or perhaps any automobile of the other at such times as he desired, if available."

*Id.* at 526. *Wallace* thus suggested that the exclusion would reach situations in which the vehicle's owner retained actual control, including the right to place certain limits on the insured's use of the vehicle. *See id.* (vehicle subject to exclusion could be one that the insured could only use "if available[,]" a matter presumably within the control of the actual owner, not the insured). Further, by recognizing that the exclusion might apply if an insured had the right to use "any automobile of another," *id.*, not just an automobile specifically assigned to the insured, the *Wallace* court does not appear to have been concerned about any rights—such as *de facto* ownership rights—other than the right that the insured had to use a vehicle that belonged to someone else.

Moreover, plaintiff's emphasis on the word "permanent" fails to acknowledge the qualifiers that *Wallace* placed before that term: "*rather* permanent" and "*more or less* permanent." *Id.* at 526, 527 (emphases added). And even when using the word "permanent" in those qualified ways, the court did not seem to suggest that *only* vehicles made available to that extent would be subject to the exclusion. Rather,

the court sought to distinguish situations that clearly fell within the "furnished for regular use" exclusion from truly temporary or incidental uses, which would not. As *Wallace* explained, the policy in that case did not exclude vehicles that "the insured or his wife might perhaps on infrequent occasions obtain permission of various owners to use." *Id.* at 526 ("The term 'furnished for regular use' does not embody the term 'for temporary use[.]'"); *see also id.* (exclusion does not apply to "situations where the use is but for a single occasion or single purpose"). Thus, the court was describing polar opposites, with the exclusion clearly encompassing one pole and just as clearly *not* encompassing the other. *Id.* at 527 (explaining that exclusion would apply to situations in which an insured had "more or less permanent use of the automobile when available[,]" but not to those merely involving "temporary *** use").

As to whether *Wallace* at least contemplated situations in which the insured had sufficient control over the other vehicle to add it to their own policy, we are hesitant to read that into the court's rationale. It is true that *Wallace* held that the insurer should not be the one to bear the risk of an accident occurring while an insured was driving a vehicle someone else had furnished for the insured's regular use; that *could* be read as suggesting that, if an insured wanted insurance coverage for a vehicle that another had furnished for their use, then the insured should be required to pay for that coverage. *See id.* at 526 (noting one purpose of the exclusion is "to eliminate the risk to the insurer of the use of automobiles usually at hand" for the insured, rather than the insured's own vehicle). Further, the policy at issue there, similar to ORS 742.504(4)(b), extended the "regular use" exclusion to vehicles that had been "'furnished for [the] regular use'" of "'member[s] of the same household,'" which could be read as intending to reach vehicles that an insured did not own but as to which they might exercise or share significant authority, including with regard to obtaining coverage. *See id.* at 523 (quoting policy). But *Wallace* also appears to have viewed "furnished for regular use" as encompassing the right to use any of a number of vehicles owned by someone else—such as an automobile dealership—and it is unlikely that the court reasoned that insureds would have a quasi-ownership interest in

each such vehicle. *See id.* at 526 (referring to "an expressed or implied understanding with the owner of an automobile that the insured could have the use of the particular automobile or perhaps *any automobile of the other*" (emphasis added)).[13] Thus, even though *Wallace* clearly contemplated that vehicles subject to the exclusion would be ones that it would not be fair to expect insurance companies to insure without receiving corresponding premiums, it did not suggest that those circumstances included only ones in which the insureds themselves were in a position to acquire the desired coverage.[14]

### 3. *Legislative history*

Defendant and *amicus curiae* Oregon Trial Lawyers Association (OTLA) have both discussed legislative history, and we have independently reviewed it. The legislation was introduced in two different legislative sessions and reviewed by an interim committee before being finally adopted in 1967. *See* Or Laws 1967, ch 482, § 3 (enacting what is now ORS 742.504).[15] Neither the parties nor we have identified any

---

[13] *Wallace* may have made that statement in contemplation of a very early decision regarding "furnished for regular use," which involved a car salesman injured while driving one of his employer's cars: *Farm Bureau Mut. Auto. Ins. Co. v. Boecher*, 48 NE2d 895 (Ohio Ct App 1942) (cited to the *Wallace* court in briefing but not cited in the opinion). The salesman was entitled to use any car on the employer's lot for demonstration purposes, and he very often took such cars home; he had never however, previously driven the particular car in which the accident occurred. 48 NE2d at 895-96. The Ohio Court of Appeals nevertheless concluded that that car had been "furnished for regular use" within the meaning of an insurance policy issued to the salesman's wife, as would, in that court's view, be true as to any of the employer's cars, given their availability for the salesman's use both as part of the business day and at his discretion when driving home at night:

"We believe this would [also] be true as to any automobile in the group of used cars, whether or not it was the first time that he was driving it, because, although he might not customarily or frequently drive any specific car in the group, each and all of these cars were furnished to him for his regular use, either in the business during the day or if he desired to drive home at night."

*Id.* at 896.

[14] The *Wallace* court may have contemplated that, in the case of an auto dealership or other employer that owned a fleet of vehicles, the employer would provide the desired coverage. Indeed, those were the circumstances here: Plaintiff's employer, the State of Oregon, insured the Silverado, and plaintiff was paid the limits of the policy's underinsured motorist benefits. Thus, to the extent that the legislature sought to place the burden on someone other than insurers to bear that risk (or pay for coverage so as to insure against it), the circumstances here arguably satisfied that objective.

[15] This court summarized that history in *Vega*, explaining that what became ORS 742.504:

part of that legislative history that further illuminates the intended scope of the phrase "furnished for the regular use[.]" The legislative history that has been cited to us is either too general[16] or too indirect[17] to give any material aid to the definition.

  4.  *Establishing "for Regular Use"*

  In summary, we conclude the following regarding the statutorily authorized exclusion for vehicles "furnished for the regular use" of an insured.

---

"was first considered as part of a 1963 insurance bill, HB 1809 (1963), that was tabled by the Senate Judiciary Committee. That bill was substantially incorporated into HB 1041 (1965), that was under consideration in the next (1965) legislative session. The latter bill passed both houses of the legislature but ultimately was defeated by a governor's veto. The vetoed bill was, in turn, substantially incorporated into an insurance bill under consideration in the 1967 legislative session, HB 1506. The text of ORS 742.504[] finally became law when that bill was enacted by that legislature and signed by the governor in 1967."

323 Or at 305 n 12.

[16] OTLA's most relevant quote appears to be the following from the 1964 Interim Committee on Insurance:

  "The first proposed exclusion is to carry out the rating intent discussed by industry representatives and subcommittee members at an earlier date; to charge a premium for UMC [(uninsured motorist coverage)] on each owned auto for which the company has issued a liability policy and to exclude coverage on such autos which the insured has not seen fit to insure. This exclusion is necessary to effect that rating intent since the Insuring Agreements on pages 2 and 3 of the rough draft of the bill don't require the insured to be in an 'insured' auto to be protected by this coverage. Thus, in the absence of this conclusion the [ insured could] insure one of his cars and automatically receive free UMC coverage on his other automobiles. This would serve to greatly increase the UMC rate and be very inequitable to persons who own only one car."

Minutes, Interim Committee on Insurance, Subcommittee #4, Sept 18, 1964 (statement regarding amendments proposed by Nationwide Insurance Co.). The statement (which appears to actually discuss the "regular or frequent use of the insured" provision now in ORS 742.504(2)(d)(B)) addresses vehicles that the insured owns—something that was already in the text of the statute. It does not shed any light on what the legislature meant when it expanded the definition to also include vehicles "furnished for the regular use[.]"

[17] Defendant summarizes its excerpts from legislative history as showing that the legislature was balancing uninsured motorist coverage for Oregonians "with the resentment from the public at being forced to purchase insurance, which is one of the main considerations regarding the minimum limits, because the higher the minimum limits, the higher the cost for purchasing the required insurance." Defendant does not explain how that is helpful to determining when a vehicle has been "furnished for the regular use" of an insured.

First, the plain text, as viewed through the lens of *Wallace*, indicates that the insured must have been granted the privilege or benefit of using the vehicle on a steady or uniform basis; further, whether or not the insured actually exercises that right, the opportunity to do so must at least arise with some degree of frequency.

Second, the determination whether a vehicle has been "furnished for the regular use" of an insured will ultimately depend on the breadth of the privilege or benefit granted to the insured. *See Wallace*, 220 Or at 526-27 (distinguishing manner of actual use from insured's right to use vehicle). In some cases, the parties involved will have a written or oral agreement that precisely dictates when and under what circumstances a person is permitted to use another owner's vehicle. In other cases, however, the evidence regarding the scope of an insured's right may be less direct. Although in this case there was some direct evidence regarding the scope of plaintiff's authorized use, the indirect evidence sheds further light on whether her employer authorized "regular use" within the meaning of ORS 742.504(4)(b). Because it will likely aid future inquiries, we pause to describe some forms of indirect evidence that can inform whether a vehicle has been "furnished for * * * regular use."

One such form of indirect evidence would be how frequently, and for what reason, the insured had previously used the vehicle. Although nothing in the text, context or legislative history of ORS 742.504(2)(b) requires a showing of prior use, the extent to which an insured actually used another's vehicle is at least circumstantial evidence of what use was permitted. That is, even though we have noted that the insured's actual use of a vehicle is not dispositive, frequent prior use of a vehicle would be some indication that an insured has been granted a broad privilege to use it.

Another form of indirect evidence is whether, as in this case, the vehicle in question was owned by the insured's employer, though the significance of that fact will likely vary from case to case. In some cases, that fact might warrant considerable weight. For example, a "company car" that an employee is permitted to use as a fringe benefit of their employment—whether in the form of an assigned vehicle or

a comparable right to choose from any number of cars in an employer's fleet—might be considered a prototypical example of a vehicle that has been "furnished for the regular use" of an insured. *See Wallace*, 220 Or at 526 (describing "an expressed or implied understanding with the owner of an automobile that the insured could have the use of the particular automobile or perhaps any automobile of the other at such times as he desired"). That is, such arrangements often contemplate both a rather broad scope of use *and* a use that occurs quite frequently.

Notably, even before Oregon adopted ORS 742.504(4)(b) in 1967, other jurisdictions had concluded that a "company car" or equivalent had been "furnished for regular use." *See, e.g., O'Brien v. Halifax Ins. Co.*, 141 So 2d 307, 308 (Fla Dist Ct App 1962) (insured was police officer driving one of four city-owned police vehicles); *Moore v. State Farm Mut. Auto. Ins. Co.*, 239 Miss 130, 133, 135, 121 So 2d 125, 126-27 (1960) (insured used one of employer's 10 trucks two-to-three times a week); *Kennedy*, 52 Del at 47-48, 152 A2d at 118-19 (single employer-owned vehicle that insured used every weekday); *Iowa Mut. Ins. Co. v. Addy*, 132 Colo 202, 204, 206, 286 P2d 622, 623-24 (1955) (company car); *Farm Bureau Mut. Auto. Ins. Co. v. Marr*, 128 F Supp 67, 70-71 (DNJ 1955) (one of four motor pool cars had been "furnished for regular use" to insured when insured was the agent in charge of government office with four other agents; insured had driven a motor pool car roughly 50 times in the 10 months before the accident, and accident occurred while insured was taking car home on government business);[18]

---

[18] In *Marr*, the United States District Court identified several "signposts" relevant to determine whether a vehicle had been furnished for regular use," based on cases from numerous jurisdictions. *Id.* at 70. Those were:

"1. Was the use of the car in question made available most of the time to the insured?

"2. Did the insured make more than mere occasional use of the car?

"3. Did the insured need to obtain permission to use the car or had that been granted by blanket authority?

"4. Was there a purpose for the use of the car in the permission granted or by the blanket authority and was it being used for such purpose?

"5. Was it being used in the area where such car would be expected to be used?"

*Id.*

*Davy v. Merchs. Mut. Cas. Co.*, 97 NH 236, 238-39, 85 A2d 388, 389-90 (1952) (insured was taxi driver and one of three drivers using employer's two taxis). Although some contemporary cases had held that a "company car" or equivalent had not been "furnished for regular use," they often did so only because the accident had happened on a trip outside the scope of the employer's permission. *See, e.g.*, *Schoenknecht v. Prairie State Farmers Ins. Asso.*, 27 Ill App 2d 83, 97-98, 169 NE2d 148, 155-56 (1960) (employer-assigned vehicle was not "furnished for regular use" when insured was using it outside business hours and for personal reasons); *Lewis*, 56 Cal App 2d at 599-600, 132 P2d at 848 (salesman who regularly used one of several cars provided for demonstration purposes; demonstration car was not "furnished for regular use" when salesman had obtained special permission to take the car on a personal trip outside town).

Other forms of indirect evidence may also inform whether a vehicle has been furnished for the regular use of an insured. By specifically identifying certain forms of evidence, we do not purport to establish a required or exclusive list of relevant factors. We emphasize the two that we have because they are at least somewhat relevant to our disposition, given the summary judgment record and the factual context in which this case arises, and because the rationale underlying our reliance on them may assist others undertaking the same inquiry.

C. *Application*

The remaining question, then, is whether the trial court correctly granted defendant's motion for summary judgment and denied plaintiff's cross-motion. In answering the first part of that question, the ultimate inquiry is whether all reasonable factfinders would find that the Silverado had been "furnished for [plaintiff's] regular use," that is, that plaintiff had had the right to use the Silverado in a steady or uniform manner and her right to do so arose with at least some degree of frequency. Construing the summary judgment record in the light most favorable to plaintiff, the nonmoving party for this part of our analysis, and applying our interpretation of "furnished for the regular use," we conclude that there remain genuine issues of material fact and

that the trial court therefore erred in granting summary judgment to defendant.

We begin with the fact that ODF, plaintiff's employer, had a fleet of available vehicles for its employees in the Roseburg office and assigned most of those vehicles to individual employees. If plaintiff had been one of those employees, it would have been strong evidence (though not conclusive) that the Silverado had been "furnished for [her] regular use." But plaintiff was not one of those employees. The fact that ODF had vehicles available for assignment and yet concluded that plaintiff's job duties involved insufficient travel—or that her corresponding opportunity to use an ODF vehicle arose on an insufficiently steady or uniform basis—to warrant assigning one of them to her, is affirmative (though not necessarily conclusive) evidence that the Silverado was *not* "furnished for [her] regular use."

Turing to the evidence of plaintiff's prior use, we conclude that it also falls short of the sort of frequency that would *compel* the finding that the Silverado had been "furnished for [her] regular use." Plaintiff's authorization to use the Silverado—or any vehicle within ODF's fleet—existed only when her work duties required it. And her work duties (as far as the record shows) required it relatively infrequently. There is no evidence that plaintiff used the Silverado (or any other work vehicle) for the first five years that she worked for ODF. Even disregarding those earlier years, the evidence shows only that plaintiff used a work vehicle during three months in 2017 and another three months in 2018. Furthermore, those uses apparently all involved fire assignments, which means that plaintiff's use of the Silverado was largely contingent on (1) there being a wildfire; (2) ODF requiring resources for that fire that included plaintiff's specific work skills; and (3) plaintiff's ability and willingness to accept an assignment to the fire.

Given the summary judgment record, we conclude that the evidence—viewed in the light most favorable to plaintiff—was not sufficient to compel, as a matter of law, a finding that the Silverado had been "furnished for [plaintiff's] regular use." That is, we are not convinced that, on the basis of that record, all reasonable factfinders would

find that ODF had given plaintiff the privilege of using the Silverado on such a steady or uniform basis and with sufficient frequency for that use to be "regular," much less "at such times as [plaintiff] desired[.]" *Wallace*, 220 Or at 526.

Resisting that conclusion, defendant argues—as the Court of Appeals concluded—that the fact that plaintiff could use the vehicle for work purposes "as needed," without the need to request permission, established that the Silverado was "furnished for [her] regular use." *Sheppard*, 333 Or App at 45. We disagree. Plaintiff's right to use the vehicle without asking permission was only "as needed," which, as noted, was dictated solely by her work duties. The evidence as to when plaintiff's "need[ ]" to use a vehicle arose was specific to ad hoc fire assignments and dependent upon her supervisor's authorization. Plaintiff's purported authorization to take the vehicle "as needed," then, is somewhat illusory, as that need was substantially dependent upon her supervisor's underlying authorization to accept a fire assignment. Moreover, defendant's understanding would effectively equate "regular use" with "regular *work* use." While we do not foreclose the possibility that regular work use *could* constitute "regular use," we disagree that plaintiff's right to use the Silverado "as needed" for fire assignments constituted "regular use" as a matter of law.

That, in part, is because even an authorization that arose every time that defendant was assigned to a fire would not indisputably be "regular," given the necessary confluence of a wildfire, a need for someone with plaintiff's skills, and an agreement to have plaintiff take the assignment. That is, even if such authorized use could be deemed "steady" or "uniform" in the sense that it arose every time that those elements aligned, the record does not compel the finding that, over the course of plaintiff's employment, it arose with any degree of "frequency."

Thus, when viewed in the proper light, the summary judgment record does not compel, as a matter of law, the finding that the Silverado (or any ODF vehicle) was "furnished for [plaintiff's] regular use." The trial court therefore erred in granting defendant's summary judgment motion.

Turning, finally, to plaintiff's cross-motion for partial summary judgment, the foregoing discussion and our disposition of defendant's motion largely foreshadows our conclusion as to plaintiff's motion. Plaintiff's contention is primarily a legal one: She asserts that an employer-provided vehicle, the use of which is strictly limited to work purposes, can never be considered "furnished for the regular use" of an insured within the meaning of ORS 742.504(4)(b). As our analysis above suggests, we disagree with that contention and, consequently, plaintiff's position that she was entitled to summary judgment on the issue of "regular use." As we have explained, the exclusion does not require "*de facto* ownership" or an unrestricted right to use the vehicle. Further, whether an insured has the right to use a vehicle on a steady or uniform basis that arises with some degree of frequency is a factual inquiry, one that depends upon a variety of matters and that can be established through both direct and indirect evidence of the scope of the authorized use. Here, as noted, that evidence includes that the Silverado was owned by plaintiff's employer, ODF; that she repeatedly received and accepted fire assignments over the two summers that preceded her accident; that she drove the vehicle over substantial distances and for extended periods during those assignments; and that, even though her use corresponded to only a few months out of each year, that use appears to have regularly tracked the fire season, making it arguably steady or uniform in relation to that aspect of plaintiff's employment. Thus, although we disagree with defendant's contention that those circumstances compel the finding that ODF furnished the Silverado for plaintiff's regular use, we also disagree with plaintiff's argument that, when viewed in the light most favorable to defendant (the nonmoving party for purposes of plaintiff's motion), those same circumstances compel the opposite finding: that the Silverado was *not* furnished for plaintiff's regular use. As a result, we conclude that the trial court did not err in denying plaintiff's partial motion for summary judgment.

### III.  CONCLUSION

We conclude that the trial court erred in granting summary judgment for defendant and that the Court of

Appeals therefore erred in affirming on that basis. We also conclude, however, that the trial court did not err in denying plaintiff's motion for partial summary judgment.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.